**JAMES L. GAVAGAN v. TOM MARSHALL, RAY GREEN, JOE F. HAMMOND, ROBERT D. GORDON, and W. HOWARD BELOTE, as County Commissioners of Duval County, Florida.**

33 So. (2nd) 862                                         January Term, 1948
February 13, 1948                                                En Banc

*Evan T. Evans,* for appellant.

*J. Henry Blount,* for appellees.

BARNS, J.:

The material portions of the record on appeal are: (1) The alternative writ of mandamus; (2) respondent's motion to

quash; (3) order quashing the alternative writ; (4) entry of appeal; (5) assignments of error. When these matters were certified to there was no occasion for the record containing more, and all other matters need only have been recited.

The appellant-relator procured an alternative writ of mandamus reciting that, as Justice of the Peace of the fifth District of Duval County, he held a coroner's inquest making inquiry as to the cause of the death of Hal William Skinner, who died under circumstances giving rise to a good reason to believe that his death was caused by the criminal act of another and prompted thereby held such inquest as provided by his constitutional power and the laws of this State relative thereto; that he filed with the County Commissioners of such county his requisition for the correct amount of costs, in the sum of $14.65, which requisition was disapproved and disallowed by said Board because "no direction from the Judge, the prosecuting atterney or some assistant prosecuting attorney of a court having trial jurisdiction of felonies committed in Duval County, Florida, was attached to said cost bill, as purported to be required by the provisions of Section 946.03, F.S.A." (Section 3 of Chapter 21965, Acts of 1943).

The alternative writ further recited that "the said Section 936.03, F.S.A., known also as Section 3 of Chapter 21965, Acts of 1943, is unconstitutional, invalid and void and of no force or effect whatsoever; that in consequence of the invalidity of said statute, the respondents have no lawful rights or authority to withhold approval for payment of relator's cost bill."

The trial judge, upon a hearing of respondent'-appellees' motion to quash said alternative writ, granted same and thereupon petitioner brought this appeal.

The Constitution vests the judicial power of the state in specified courts, including justices of the peace. (See Art. 5, Sec. 1, Constitution of State of Florida). And provides as to jurisdiction that:

" . . . Justices of the Peace shall have the power to hold inquest of the dead. . . . "—Sec. 22, Art. 5, Constitution of State of Florida.

The statutory provisions as to when an inquest shall or may be held, and when compensable, are as follows:

"Justices of the peace within their respective districts shall hold inquest of the dead when so directed as provided in Sec. 936.03, and to that extent shall be deemed coroners. In case the justice of the district in which the death occurs or the dead body is found shall for any reason be unable to hold an inquest, it shall be held by the county judge of the county in which the death occurs, or where the dead body is found, or by a justice of the peace of one of the adjoining districts of the county. (As amended, Laws 1943, c. 21965, Sec. 1.)—Sec. 936.01, F.S. 1941, F.S.A.

"Inquests may be taken:

"(1) Of all violent, sudden and casual deaths where there are no eyewitness or eyewitnesses to the killing or cause of death, and such deaths occur under circumstances indicating that death was caused by some criminal act or was the result of criminal negligence;

"(2) Of all sudden deaths in prison or other state, county, municipal and such public institutions, without an attending physician;

"(3) Of all dead bodies found within the county, whether of persons known or unknown, when there are no known eyewitness or eyewitnesses and it is apparent, from the body or the surrounding circumstances, that death was caused by some criminal act or was the result of criminal negligence, or when the deceased died or disappeared under circumstances indicating foul play; and,

"(4) When otherwise ordered by a court of record having jurisdiction of felonies, upon petition of the prosecuting attorney thereof. (As amended, Laws 1943, c. 21965, Sec. 2.—Sec. 936.02, F.S. 1941, F.S.A.

"(1) Every coroner, as soon as he knows or is informed that the dead body of any person, supposed to have come to his death under any of the circumstances mentioned in subsection (1), (2) or (3) of Sec. 936.02 has been found within his district, shall forthwith make a preliminary investigation into the facts and circumstances surrounding the death and ascertain the names and addresses of all persons having knowledge thereof, and report the same to the judge, the prosecuting attorney or some assistant prosecuting attorney

of any court having trial jurisdiction of felonies committed in the county where the dead body of such deceased person is found. If, upon consideration of such report and upon such further investigation of the facts and circumstances surrounding the death as such judge, prosecuting attorney or assistant prosecuting attorney may deem necessary, the said judge, prosecuting attorney or assistant prosecuting attorney finds that there is reasonable ground for believing that such death was caused by the criminal act or the criminal negligence of another, and further finds that an inquest is necessary, he shall direct that the coroner forthwith cause a coroner's jury to be summoned to be and appear before him, at a specified time and place, to inquire, after a view of the dead body, how and in what manner and by whom the deceased came to death. The coroner shall, forthwith upon being directed as aforesaid, or when directed pursuant to subsection (4) of Sec. 936.02, make out his warrant, which warrant shall state the grounds upon which it is believed that death was caused by the criminal act or criminal negligence of another and recite the order and direction for impaneling a jury and be directed to the constable of the district, if there be one, and if not, then to any constable of the county or to the sheriff, directing that he forthwith summons a coroner's jury to be and appear before the said coroner, at the time and place therein to be named, inquire how and in what manner and by whom the deceased came to his death.

"(2) The report of the preliminary inquiry, by the coroner to the judge, prosecuting attorney or assistant prosecuting attorney, may be made by mail, by telephone or by telegram confirmed by mail, and the direction for holding the inquest may likewise be given. *A copy of the direction for holding the inquest shall be attached to the coroner's cost bill and no cost bill shall be approved or paid unless and until a copy of such direction is attached as aforesaid.*" (As amended, Laws 1943, c. 21965, Sec. 3.)—Sec. 936.03, F.S. 1941, F.S.A.

Concerning compensation to public officers, this Court, in the case of Rawls et al., as County Commissioners, v. State ex rel. Nolan, 98 Fla. 103, 122 So. 222, headnote 1, has held:

"Public officers have no claim for official services rendered, except when, and to the extent that, compensation is provided

by law, and when no compensation is so provided rendition of such services is deemed to be gratuitous."

The above case was decided in 1929, and in a later case, State ex rel. Landis v. Reardon et al., 114 Fla. 755, 154 So. 868, decided in 1934, this Court quoted with approval the exact language quoted above from Nolan case.

In the Nolan case, supra, quoting from the opinion, this Court further said:

"It is competent for the Legislature to prescribe that the compensation of county officers shall be confined to that allowed for services rendered the public, as in assessing or collecting one class of taxes without any allowance for assessing or collecting other classes of taxes."

Also in the much later case of State ex rel. May v. Fussell, et al, 157 Fla. 55, 24 So. (2nd) 804, this Court again used the same language quoted above from the Nolan case, and further said:

"The duties of a public officer may be exacted without specific compensation"—and

"Such statutes are strictly construed . . . "

A somewhat related statute to the one here under consideration is to be found in Section 939.14, F.S.A., which we quote:

"When a committing magistrate holds to bail or commits any person to answer a criminal charge in a county court, a criminal court of record, or a circuit court, and an information is not filed nor an indictment found against such person, the costs of such committing trial shall not be paid by the county, except the costs for executing the warrant."

The above statute was under attack in the case of Barrow et al. v. State ex rel. Campbell, 77 Fla. 773, 82 So. 293, and this Court upheld the same. Pertinent parts of the opinion in said case, we quote:

"Under the Constitution, the compensation of a county judge is provided by law. Where a county judge acts as a committing magistrate, he is by the Constitution entitled to his 'legal costs' 'under such regulations as shall be prescribed

by law.' The law prescribes the 'legal costs and expenses, including the fees of officers,' that in 'criminal cases are prosecuted in the name of the state,' 'shall be paid by the counties where the crime is committed,' and payments thereof are required· to be made 'under such regulations as may be prescribed by law.' These organic provisions contemplate the payment to a committing magistrate only such fees as shall be prescribed by statute. *This being so, the statute is not invalid because it excludes fees in certain matters."* (Underscoring supplied).

In 43 American Jurisprudence, Page 134, we find the following:

"In considering constitutional and statutory provisions relating to the compensation of public officers, certain principles derived from the common law must be kept in mind. It is necessary to have in view the nature of a public office, and not to lose sight of the fact that an office is usually not regarded as a contract or as a vested property right, but rather as a public trust to be exercised for the benefit of the public. It embraces the idea of tenure, duties, and emoluments. *But compensation is not indispensable to a public office; it is not part of the office but merely incident thereto,* and attaches to the office itself *and not to* the officer, except as he is an officer de jure. Whatever salary or emoluments may be attached by law to a public office do not belong to the incumbent because of any supposed legal duty resting upon the public to pay for the services rendered by him. In fact, it is sometimes expressly provided that certain officers shall receive no compensation, and a law creating an office without any provisions for compensation may carry with it the implication that the services are to be rendered gratuitously."

The origin and development of the office of Coroner is of interest. Webster defines it as follows:

"Orig., in England, an officer (called custos placitorum coronae), established by an ordinance of 1194, whose duty was to keep (a record of) the pleas of the crown in a county and guard the royal revenues arising from them. Now, by a gradual change of function, a public officer whose principal duty is to inquire by an inquest held in the presence of a jury

(called a coroner's jury) into the cause of any death which there is reason to suppose is not due to natural causes. By statute in some of the United States and in some British colonies his duties have been changed or the office abolished, a medical examiner taking his place in some jurisdictions."

American Jurisprudence states:

"A coroner was known in the Latin of the Middle Ages as "coronator," from corona, the Crown, and was so called because he took cognizance only of the pleas of the Crown and was the principal servator of the peace. He had the power at that time to hear and determine felonies, and therefore his court was analogous to the ordinary courts of law. His powers were later abridged, however, by Magna Charta. Under the early common law, the office of coroner was one of great dignity, the coroner being, next to the sheriff, the most important civil officer in the county. His powers and duties were both judicial and ministerial. His judicial authority extend to inquiries concerning the manner of death of any person slain, or who died in prison, or who otherwise came to a violent or sudden death. He was only entitled to do this super visum corporis and for such purpose the coroner's court was considered a court of record. As a part of his judicial powers, however, the coroner also had authority to make inquiries respecting treasure-trove and shipwreck. His ministerial office was simply to act as the sheriff's substitute—that is, to perform the duties of that officer whenever the latter was disabled from doing so. The coroner's principal duty, however, was to inquire into the manner in which persons came to their deaths where there was any reason to suppose that death might not have been due to natural means. The general nature of the office of coroner is the same today, but his duties and authority are specifically defined by statute and he can only act within the limit of his statutory authority. Under statutes in some jurisdictions, where the coroner is absent from the county or is unable to attend, his duties may be performed by a justice of the peace, and in such case the justice has the usual powers of the coroner."—13 Am. Jur., p. 106.

The development of the office is fully reflected by quotations from Holdsworth, found in the footnote.[1]

To hold an inquest is a service to the State. It is for the public interest and public welfare and, when compensable, is paid for by the public. It is within the State's power, acting through the Legislature, to prescribe when an inquest shall be held and when it shall be compensable.

The statute in question (Sec. 936.03, F.S.A.) merely provides a method by which the burden of determining whether an inquest shall be held shall be borne by the Justice of the Peace and those charged with the prosecution of crime or judges of courts where those charged with crime may be tried. It is well recognized that when one has a pecuniary interest in a determination of a matter that he is not as impartial as he would be if he had no such interest. See Tumey v. Ohio, 273 U. S. 510.

---

[1] "We have seen that the powers of the sheriff in the twelfth century were very great; and it is clear from the Inquest of Sheriffs (1170) that the crown was already viewing them with some suspicion. To put an official by the side of the sheriff to check his powers, and safeguard the interests of the crown was an obvious expedient. It is probable that this was the reason for the institution of the coroner who had, by the end of the twelfth century, become a definitely recognized official. . . . —Holdsworth's History of English Law, Vol. 1, p. 82.

"Throughout the thirteenth and fourteenth centuries there were usually four coroners for each county, who must be resident and have sufficient land in their county to answer the king and people. They were elected in the county court, and, like other mediaeval officials. they were obliged to serve without remuneration, till, in Henry VII's reign, a fee of 13s. 4d. for every inquest of death was established. Hence it is not surprising to find that persons got royal grants of exemption from liability to undertake the office. Modern statutes have put the office on quite a different basis. In 1844 the counties were divided into coroner's districts; in 1860 a fixed salary was provided; and in 1888 their appointment and the fixing of their salary was transferred to the county councils.

"The duties of the coroner were originally wide. The office was established for the purpose of safeguarding the pecuniary interests of the crown, and more especially its pecuniary interests arising from the administration of the criminal law. He must keep a roll which was of great value to the justices in eyre, because it enabled them to check the verdicts of the juries of the hundreds, and to provide for the king a plentiful crop of amercements. He must execute process in the sheriff's stead 'when there is just exception taken to the sheriff'—on the ground, for instance, that he was party to the case. He had many various duties to perform in relation to the criminal law. Thus he must receive and enter the appeals or criminal accusations of those who wished to accuse another of felony; he must receive the declarations of approvers; he must keep a record of outlawries; he must receive the confession and

For the State to determine by means of law when it shall *invoke* the power of its Justice of the Peace to hold a coroner's inquest is not to impair the *exercise* of judicial discretion in any such inquisitorial proceeding.

Since an inquest is for the benefit of the sovereign, and not for private interests, and is to be paid for by the public, it follows that the sovereignty may prescribe conditions precedent for the holding of an inquest for pay and the conditions under which such an inquest may be dispensed with or excused.

The judgment appealed is affirmed.

THOMAS, C. J., TERRELL, CHAPMAN and SEBRING, JJ., concur.

BUFORD and ADAMS, JJ., dissent.

---

abjuration of criminals who had taken sanctuary. His services were useful in securing the appearance of suspected persons. He could cause such persons to be arrested; and, in 1554, he was required to put into writing the effect of any material evidence given at the inquest held by him, and was empowered to bind over witnesses appearing at the trial.(*)

(*) See statute of Philip and Mary, Holdsworth's History of English Law, p. 296, and Sec. 936.10, F.S.A.

"The duty which was imposed upon the coroner to hold an inquest followed from the fact that he was especially bound to safeguard the rights of the crown. In order to safeguard these rights, he was obliged, in many cases to impanel a jury and hold a court, which was a court of record, to enquire into their existence. Thus he must hold inquests as to wreck, as to royal fish, as to the finding of treasure trove, and as to unexplained death, because in all these matters the crown was pecuniarily interested. By its prerogative it was entitled to wreck, royal fish, and treasure trove; and the death of a man might bring the crown revenue in many ways. The hundred was liable to a fine if Englishry could not be proved; (**) the thing which caused the death was forfeit to the crown as a deodand; the chattels of the man, if a suicide or convicted of celony, were likewise forfeited. . . .

(**) The offense was to kill a Norman and the penalty was avoided by proving the corpse to be that of an Englishman, and it was made a prima facie presumption in law that the corpse was that of a Norman.

"Changes in the judicial system and changes in substantive law rendering obsolete many of the duties of the coroner. When the general eyre ceased, his rolls ceased to be of such great importance to the itinerant justices; and the abolition of criminal appeals, approvers, sanctuary, and abjuration, and the practical abolition of outlawry took away many of his duties. The Coroner's Act of 1885 expressly abolished others. Thus Section 44, after repeating the old prohibition against holding the pleas of the crown, goes on to provide that he shall not 'hold inquests of royal fish or of wreck, nor of felonies, except felonies on inquisition of death; and he shall not enquire of the goods of such as by the inquest are found guilty of murder or manslaughter, nor cause them to be valued and delivered to the township." His chief surviving

ADAMS, J. dissenting:

I think the statute as framed is calculated to coerce the exercise of judicial opinion. The question of whether to hold an inquest frequently requires the exercise of judicial discretion and is just as important as actually holding the inquest. The Constitution vests that discretion in the Justice of the Peace. Article V, Section 22, Florida Constitution. To say that this constitutional officer cannot receive his usual and lawful fees, unless and except in cases where he first procures the approval of a person who in no sense shares the judicial responsibility, can have no other effect than to coerce the judgment of the Justice of the Peace.

Nothing is more abhorrent than to rest the exercise of judicial functions upon the contingency of remuneration. See Rollo v. Wiggins, 149 Fla. 264, 5 So. (2nd) 458. There is no better establishment concept of American jurisprudence than the plan that the three branches of our government shall remain separate from eich other. We, as other courts, have said that the legislative branch cannot exercise judicial functions. Thursby v. Stewart, 103 Fla. 990, 138 So. 742. Inasmuch as the legislature cannot exercise judicial functions it follows, therefore, that it may not delegate the functions to its agency. This statute, by indirection, gives the executive branch of the government judicial functions.

We have held more than once that the legislature is without power to interfere with the exercise of judicial power. Ruff v. G. S. & F. Ry. So., 67 Fla. 224, 64 So. 782; State ex rel. Cartmel v. Aetna Casualty & Surety Co., 84 Fla. 123, 92 So. 871.

BUFORD, J., concurs.

---

duty is to act for the sheriff in executing process in cases where the sheriff has as interest in the proceedings; and the chief functions performed at his court are to hold inquests in cases of unexplained death, and as to the concealment of treasure trove. The holding of the former kind of inquest is by far his most important function; and it is a curious illustration of how a procedure, invested for one purpose, has come, in a changed order of society, to be used for another. Such inquests are now held, not to safeguard the pecuniary interests of the crown, but to aid the administration of justice by careful enquiry into the circumstances of any suspicious death."