[No. 35379. *En Banc.* February 16, 1961.]

*In the Matter of the Application of* RICHARD N. BORCHERT *for a Writ of Habeas Corpus.*[1]

[1]Reported in 359 P. (2d) 789.

*Charles O. Carroll, Hugh R. McGough,* and *Robert E. Dixon,* for appellant.

*Henry Opendack* and *Irving C. Paul, Jr.,* for respondent.

OTT, J.—Richard N. Borchert, while driving an automobile outside of an incorporated city or town in King county, was arrested for driving a motor vehicle while under the influence of intoxicating liquor, reckless driving, and operating a motor vehicle without a valid operator's license. The venue was laid, as provided by law, in the justice court nearest to the point of the alleged violation. Upon arraignment before the unsalaried justice of the peace, defendant challenged the jurisdiction of the court upon the ground that RCW 3.16.070, which fixes the compensation of justices of the peace on a fee basis, was unconstitutional, in that it denied him due process of law, in violation of the fourteenth amendment to the United States Constitution.

Prior to ruling on the motion, the justice of the peace

advised defendant's counsel that she would grant a change of venue to a salaried judge at the county seat. The change of venue was refused, and the motion to dismiss was denied. The case regularly proceeded to trial.

Defendant was found guilty of driving while under the influence of intoxicating liquor, and of operating a motor vehicle without a valid operator's license. He sought a writ of *habeas corpus* before the Superior Court for King County. Petitioner contended that the fee justice lacked jurisdiction to try the case, for the reason that the justice was prejudiced against him due to the fact that the compensation of the justice was not upon a fixed salary, but upon a schedule of fees fixed by the legislature. The superior court granted the writ. The state has appealed.

The appeal presents a single question: Does RCW 3.16-.070, which provides a schedule of fees to compensate unsalaried justices of the peace, violate the due process provision of the fourteenth amendment to the United States Constitution?

Art. IV, § 1, of our state constitution, provides:

"The judicial power of the state shall be vested in a supreme court, superior courts, justices of the peace, and such inferior courts as the legislature may provide."

Art. IV, § 10, as amended by amendment 28, provides in part:

"The legislature . . . shall prescribe by law the powers, duties and jurisdiction of justices of the peace: . . . In incorporated cities or towns having more than five thousand inhabitants, the justices of the peace shall receive such salary as may be provided by law, and shall receive no fees for their own use."

Art. IV, § 13, provides in part:

"No judicial officer, *except* . . . *unsalaried justices of the peace,* shall receive to his own use any fees or perquisites of office. . . . " (Italics ours.)

RCW 3.16.070 provides the schedule of fees to compensate unsalaried justices of the peace, as authorized by Art. IV, § 13, of the state constitution.

Salaried and unsalaried justices of the peace in the State of Washington are constitutional officers. The constitution requires that justices of the peace in cities of more than five thousand inhabitants be salaried, and authorizes the legislature to compensate unsalaried justices of the peace upon a fee basis. The legislature, in the exercise of its discretion (as authorized by the constitution), has by law established the office of an unsalaried justice of the peace, and determined by RCW 3.16.070 the schedule of fees which such justices shall receive as compensation.

From the cited sections, we conclude that justice courts in the State of Washington which are presided over by unsalaried justices of the peace are constitutional tribunals, and that the compensation fee schedule provided by RCW 3.16.070 is authorized by, and in conformity with, the state constitution.

Does Art. IV, § 13, of the state constitution, which authorizes the establishment of an unsalaried justice court system, violate the due process clause of the fourteenth amendment to the United States Constitution?

Respondent asserts that such courts are unconstitutional because their presiding officers are inherently biased against an accused person. We do not agree.

For a judge to be biased or prejudiced against a person's cause is to have a preconceived adverse opinion with reference to it, without just grounds or before sufficient knowledge. It is a particular person's state of mind that affects his opinion or judgment. Bias or prejudice on the part of an elected judicial officer is never presumed. *Barbee Mill Co. v. State,* 43 Wn. (2d) 353, 261 P. (2d) 418 (1953). When it is asserted to exist, the legislature has provided an accused person an absolute right to a change of venue to another judge.

In the instant case, respondent asserts that prejudice is "inherent" in the system due to the fact that the justice's compensation is on a fee basis. The system, however, provides for both salaried and unsalaried justices of the peace, who have concurrent jurisdiction of the offense,

and who were available in this case. The respondent, if he believed the fee justice to be prejudiced against him, had an absolute right to a change of venue to a salaried judge, without cost to the accused. The respondent was represented by an attorney. The venue which provided the forum for the respondent's trial was not challenged. Jurisdiction alone was attacked upon the ground of bias or prejudice. Bias or prejudice may affect or disqualify a particular forum or venue of trial. Bias or prejudice of a judicial officer does not, however, affect jurisdiction.

■ We conclude that the contention of the respondent is without merit for the reason that the fee justice court, which forms a part of our justice court judicial system, had jurisdiction to try the respondent, and that the alleged bias or prejudice of the fee justice affected only the venue or the forum of the trial, which venue or forum was not challenged.

The trial court, in striking down RCW 3.16.070 as violative of the fourteenth amendment to the United States Constitution, relied upon the case of *Tumey v. Ohio*, 273 U. S. 510, 71 L. Ed. 749, 47 S. Ct. 437, 50 A. L. R. 1243 (1927). In that case, the accused was charged in the "liquor court" of North College Hill, Ohio, with illegal possession of liquor. The court was established by a village ordinance, and presided over by the village mayor. Unless the mayor found the accused guilty, he received no compensation for the performance of his judicial duties. The ordinance did not provide for a trial by jury, there could be no change of venue, and the right of appeal was limited to questions of law. The United States Supreme Court struck down the ordinance establishing the tribunal under the Ohio law, upon the ground that the judicial system created thereby, and under which Tumey was tried, violated the Fourteenth Amendment, in that it denied him procedural due process.

The following comparison between the village ordinance which was struck down and the existing Washington law shows the procedural safeguards afforded an accused person in this state.

724

| *Village ordinance authorized by Ohio law.* | *Washington law.* |
|---|---|
| (1) Fee justices not authorized by Ohio state constitution. | (1) Fee justices authorized by Art. IV, § 13, state constitution. |
| (2) Justices' compensation entirely dependent upon conviction. | (2) Compensation by county regardless of result. RCW 10.46.210. |
| (3) No right to a jury trial. | (3) Right to a jury trial. RCW 10.04.050. |
| (4) No right to change of venue. | (4) Change of venue guaranteed, costs to abide the result of the suit. RCW 3.20.100, 3.20.131. |
| (5) Limited right of appellate review confined to questions of law only. | (5) Right of appeal to superior court and trial *de novo,* which renders justice court action null and void. RCW 10.10.010. |

Legislation establishing fee justice courts in other jurisdictions, which contains only a portion of our legislative safeguards against possible bias or prejudice, has been upheld in the following jurisdictions: *Hill v. State,* 174 Ark. 886, 298 S. W. 321 (1927); *Brooks v. Town of Potomac,* 149 Va. 427, 141 S. E. 249 (1928); *Richardson v. State,* 109 Tex. Crim. 148, 4 S. W. (2d) 79 (1928); *Ex parte Lewis,* 47 Okla. Crim. 72, 288 Pac. 354 (1930); *State v. Schelton,* 205 Ind. 416, 186 N. E. 772 (1933); *State v. Gonzales,* 43 N. M. 498, 95 P. (2d) 673 (1939); *Gavagan v. Marshall,* 160 Fla. 154, 33 So. (2d) 862 (1948).

The respondent cites no cases in this, or any jurisdiction in the United States, where a fee justice court having safeguards against possible bias or prejudice of a justice of the peace, similar to those provided by the laws of the State of Washington, has been struck down by the United States Supreme Court as violative of the fourteenth amendment to the United States Constitution. We have found none.

An accused person arraigned before an unsalaried justice of the peace has, under existing Washington law, the procedural safeguards set forth above against the pos-

sible bias or prejudice of the unsalaried justice. The exercise of these statutory safeguards against such a possibility of prejudice affords an accused person the due process of law required by the fourteenth amendment to the United States Constitution. In the light of the salient distinguishing features between the village ordinance authorized by Ohio law and the Washington law authorized by our state constitution, the *Tumey* case is not controlling. See *Dugan v. Ohio*, 277 U. S. 61, 72 L. Ed. 784, 48 S. Ct. 439 (1928); *Bevan v. Krieger*, 289 U. S. 459, 77 L. Ed. 1316, 53 S. Ct. 661 (1933).

We conclude that RCW 3.16.070 is not violative of the due process provision of the fourteenth amendment to the United States Constitution.

■ Was respondent afforded such due process of law in the instant case? The superior court judge, in arriving at his conclusion that RCW 3.16.070 is unconstitutional, as violative of the Fourteenth Amendment, found as a fact that

"R.C.W. 3.16.070 gives the nonsalaried justice of the peace a direct and substantial pecuniary interest in reaching a conclusion against the defendant in a criminal case and for his conviction."

This finding of fact omits two crucial factual admissions, (1) that, at the time of his arraignment, the respondent was offered a change of venue to a justice court which he concedes to have been one which would have afforded him due process, and (2) that the respondent refused the court's offer to change the venue to such a court, and thereupon submitted himself to the jurisdiction of the fee justice court.

Assuming, but not deciding, that this particular justice was influenced by the fee compensation she would receive by virtue of RCW 3.16.070, the respondent was fully aware both of the judge's bias and of the fact that he was entitled to a change of venue to a salaried and (according to respondent's argument) an unbiased judge. The respondent knowingly and intelligently waived his right to be tried before a tribunal which he concedes would have afforded

him due process. Under the facts here present, any lack of due process because of the possible bias or prejudice of the justice of the peace was waived. *State v. Vanderveer,* 115 Wash. 184, 196 Pac. 650 (1921); *State v. Clark,* 125 Wash. 294, 216 Pac. 17 (1923); 57 A. L. R. 292.

Respondent strenuously argues that fee justice courts are inherently biased and that the system should be abolished. Such an argument is properly addressed to the electorate and the legislature. If the authority to establish fee justice courts in this state is to be abolished, it can only be accomplished by a constitutional amendment. If it is desired that the legislature abolish fee justice courts, which it has established pursuant to the constitution, the legislature has the power and authority to do so. The people of the State of Washington likewise have the legislative power to abolish the system by the exercise of the initiative. The argument presents a legislative problem, not a judicial one.

The judgment is reversed, and the cause remanded with instructions to proceed in conformity with the views herein expressed. Neither party will recover costs.

MALLERY and HUNTER, JJ., concur.

WEAVER, J. (concurring)—The record discloses that the framers of our state constitution were well aware that they were authorizing the legislature to provide compensation for certain justices of the peace by a schedule of fees should it be deemed advisable.

The convention of 1889 did not invent the fee system for the compensation of justices of the peace. Lack of roads, slowness and difficulty of transportation and communication, a small and scattered population, and economic conditions contributed to the necessity of *permitting* the legislature to establish an inferior court system that would serve, at minimum cost, the needs of large rural areas with small populations and still protect the rights of the individual. The majority opinion discusses those protections, and I will not repeat them.

As the majority points out, Art. IV, § 13, authorizes the legislature to provide for the compensation of justices of

the peace in the manner set forth in the statute now under attack.

The judicial article was presented by the committee to the constitutional convention July 16, 1889. It was "ordered printed and to lie over one day." Journal of the Washington State Constitutional Convention, 1889, pp. 122-130. (Unpublished; the original is in the office of the secretary of state.)

The journal discloses that on July 17, 1889,

"Mr. Turner moved that the convention resolve itself into a committee of the whole for the purpose of considering the report of the committee on Judicial Department and the article submitted . . . [by] the same. The motion prevailed. The convention then went into a committee of the whole with Mr. Cosgrove in the chair." (p. 135)

The judicial article proposed contained Art. IV, § 10, the last sentence of which read (and still reads after amendment 28, approved November 4, 1952) as follows:

"In incorporated cities and towns having more than five thousand inhabitants the justices of the peace shall receive such salary as may be provided by law, *and shall receive no fees for their own use.*" (Italics mine.)

Unfortunately, the minutes of the constitutional convention are, in some respects, incomplete; however, the proceedings on § 10 were reported in the Tacoma Daily Ledger, July 2, 1889, page 8. As we pointed out in *Yelle v. Bishop,* 55 Wn. (2d) 286, 347 P. (2d) 1081 (1959), "This report, a first-hand account of a contemporaneous event, may properly be considered. . . ."

The newspaper reported:

"Mr. Stiles moved to strike out the last words of the section, '*and they shall receive no fee for their own use.*' It lost by a vote of 21 to 16. Section 10 was adopted without amendment." (Italics mine.)

Had the motion carried, the legislature could have provided compensation by a fee schedule for justices of the peace in towns having more than five thousand inhabitants.

We said in *In re Bartz,* 47 Wn. (2d) 161, 163, 287 P. (2d) 119 (1955):

"The constitution of this state is not a grant, but a restriction on the law-making power, and the power of the legislature to enact all reasonable laws is unrestrained except where, either expressly or by fair inference, it is prohibited by the state or Federal constitution. All doubts as to whether or not a state legislature had the power to pass a given enactment must be resolved in favor of the legislature. *Union High School Dist. No. 1 v. Taxpayers of Union High School Dist. No. 1*, 26 Wn. (2d) 1, 172 P. (2d) 591, and cases sited therein."

The system of compensating, by a fee schedule, justices of the peace outside incorporated cities or towns having less than five thousand inhabitants has served the state for seventy-two years. It sprang from necessity.

The system is not a model one. Under present conditions, it does not approach minimum standards for the administration of justice. To my mind, it should be eliminated, but because conditions have changed it does not become unconstitutional. Superhighways, speed of transportation and communication, and the increase and redistribution of population are facts the legislature should consider in its search for a solution; they are not facts that support a change in the system by judicial fiat.

Believing the statutes constitutional, I would reverse the judgment and remand the cause, with instructions to proceed in conformity with the views expressed by the majority. Neither party should recover costs.

HILL, J., concurs with WEAVER, J.

FOSTER, J. (dissenting)—I dissent.

Richard N. Borchert was charged before a rural fee justice of the peace with various traffic offenses and immediately, at the outset of his trial, challenged the constitutionality of the fee system of compensating justices of the peace. He was convicted. Thereafter, he challenged the conviction in the superior court by a writ of *habeas corpus*. After trial, the court found the statutes to be in violation of the due process clause of the fourteenth amendment to the United States Constitution and made findings of fact and conclusions of law, upon which judgment was entered discharging

Borchert. This court now reverses upon the appeal of the sheriff.

RCW 3.16.070 provides the fee compensation for justices of the peace and includes, among other items, two dollars for docketing and trying a case; fifty cents for committing to jail; seventy-five cents for taking recognizance of bail; one dollar for a transcript of the judgment of conviction, which is necessary to appeal; fifty cents for issuing a warrant; and, if a party desires a change of venue, he must pay an additional fee of two dollars.

The statement of facts certified to contain all of the evidence on this point is:

"An examination of the records of King County indicates that the fees collected by justices of the peace for filing and hearing such cases constitutes a substantial sum."

Finding of fact No. 6, to which no assignment is directed and is, therefore, accepted as a verity, is:

"The public records of the King County Auditors office demonstrate that these fees, though small, over a years time total a very large sum of money to those nonsalaried justices of the peace chosen by the arresting officers."

Certain it is, therefore, that there is no proof of the claim that the fees of the unsalaried justices of the peace are unsubstantial.

RCW 46.64.010 and RCW 46.64.015 permit the arresting officers to select the justice of the peace before whom charges will be filed and are not open to dispute.

The record now before us differs factually from *Tumey v. Ohio*, 273 U. S. 510, 71 L. Ed. 749, 47 S. Ct. 437, 50 A. L. R. 1243. That judicial officer was paid only upon a conviction and only from money collected from the accused.

In this state, on the other hand, an unsalaried justice of the peace in rural areas, while compensated only by fees, is, nevertheless, entitled to such fees irrespective of conviction or acquittal. From this, the court holds that the rule of the *Tumey* case does not apply and that this makes the scheme constitutional. I think otherwise.

The fact that the trial court gave as the reason for its decision that the justice of the peace had a direct pecuniary

interest and was controlled by the *Tumey* case is not important. A wrong reason for a correct decision does not justify a reversal. *Peterson v. Hagan,* 56 Wn. (2d) 48, 351 P. (2d) 127; *Forrester v. Craddock,* 51 Wn. (2d) 315, 317 P. (2d) 1077; *Kirkpatrick v. Department of Labor & Industries,* 48 Wn. (2d) 51, 290 P. (2d) 979, per OTT, J.; *Portland Ass'n of Credit Men v. Earley,* 42 Wn. (2d) 273, 254 P. (2d) 758. Likewise, the United States Supreme Court will not reverse a judgment of a state supreme court because a wrong reason was assigned for a correct decision. *St. Louis & San Francisco R. Co. v. Brown,* 241 U. S. 223, 60 L. Ed. 966, 36 S. Ct. 602. The same rule applies in the federal system. *Brown v. Allen,* 344 U. S. 443, 97 L. Ed. 469, 73 S. Ct. 397; *Securities & Exchange Comm. v. Chenery Corp.,* 318 U. S. 80, 87 L. Ed. 626, 63 S. Ct. 454.

The court relies upon a group of cases to sustain its thesis that "Legislation establishing fee justice courts in other jurisdictions, which contains only a portion of our legislative safeguards against possible bias or prejudice, has been upheld in . . . [those] jurisdictions". An examination of those cases discloses *Hill v. State,* 174 Ark. 886, 298 S. W. 321, which came the year after the *Tumey* case, does not sustain the constitutionality of the fee justice scheme, for the basis of that decision is that, because Hill actually appealed and had a trial before an impartial judge and jury, it satisfied the *Tumey* test. That argument, however, was repudiated in 1956 by the Supreme Court of Kentucky in *Roberts v. Noel* (Ky. App.), 296 S. W. (2d) 745. There the argument was that the *Tumey* case did not apply because:

1. Noel had a right to appeal.
2. On appeal, Noel was entitled to a trial *de novo.*
3. Roberts waived his fee and costs.

In answer to these arguments, the Supreme Court of Kentucky said:

"The fact that there may be a right of appeal with trial de novo does not overcome the objectional features of the system. Under Section 367 of the Criminal Code, the justice will receive his fees, notwithstanding the appeal, if the defendant is convicted on the appeal. The incentive to convict is not lessened by the fact that an appeal may be

taken. Furthermore, as stated in Williams v. Brannen, 116 W. Va. 1, 178 S. E. 67, the accused is entitled to be tried before a fair and impartial tribunal in the first instance, where he will not be faced with the alternative of paying an unjust fine or of resorting to the delay, annoyance and expense of an appeal. . . ."

The aftermath of *Brooks v. Town of Potomac*, 149 Va. 427, 141 S. E. 249, is particularly significant. While the court upheld the Virginia statute for the same reasons as in *Hill v. State, supra,* the court commented that the case was not free from difficulties and that the statute should be amended. As a result, fee justices of the peace were supplanted by salaried trial justices. 4 (1950) Code of Virginia, §§ 16-41 to 16-74; 1936 Virginia Acts of Assembly 615, chapter 385. Three years later the American Judicature Society commented upon the success of the system.[2]

The court's reliance upon *Richardson v. State,* 109 Tex. Crim. 148, 4 S. W. (2d) 79, is odd indeed because the question here at issue was not even presented, and the court itself said that none of the circumstances present in the *Tumey* case were then before the court.

But nine months later, in *Ex parte Kelly,* 111 Tex. Crim. 54, 10 S. W. (2d) 728, when the question was presented, the court held the fee justice court system of that state unconstitutional and said of the *Richardson* case:

" . . . we held in the Richardson case, supra, that a county judge's interest, if any, in a criminal case tried before him was too remote, speculative and trivial to disqualify him. . . ."

The argument that the right to trial by jury rendered the statute valid was rejected in the following language:

" . . . While the statute allows a jury trial, it places in the power of the justice of the peace the right to control the introduction of evidence, including the right to rule on the relevancy and materiality of questions propounded by himself. These several matters furnish the background of a situation so clearly at variance with constitutional guarantees given the accused that it is remarkable chiefly because it has remained unchallenged for so many decades."

---

[2] The Trial Justice System of Virginia, 23 J. Am. Jud. Soc'y 216.

That court sagaciously commented:

" . . . The present unconstitutional status of this matter may be easily remedied by legislative enactments."

Indeed, that court held that an appeal from such a conviction would be dismissed because the whole proceeding was void. It said, in *Ex parte Biggs*, 111 Tex. Crim. 653, 13 S. W. (2d) 831, a *habeas corpus* proceeding for discharge under a conviction by a fee justice:

"The original proceedings in Justice Court being entirely void, there was nothing upon which an appeal to County Court could be predicated and nothing existed as a basis for a prosecution in County Court. . . ."

It is true that in the early 1930s[3] the Supreme Court of Indiana twice held there was no constitutional infirmity in the fee justice system, but in doing so, it has been said, it "disregarded the better weight of authority and judicial reasoning."[4]

Moreover, a violation of the individual's constitutional rights before the justices of the peace was condoned by the Indiana court as long as it was infrequent.

"It may be true that in some instances the justice has convicted in order to secure his fees, but because some justices have been too weak to withstand this temptation the whole system should not be condemned and uprooted from our judicial system." *State v. Schelton*, 205 Ind. 416, 186 N. E. 772.

But compare the reasons of the Supreme Court of Florida in *Rollo v. Wiggins*, 149 Fla. 264, 5 So. (2d) 458:

"The question is not what the effect may be on the conduct of any particular judge, but what the effect may be upon one who may easily yield to the temptation to feather his pocket even with a few extra dollars. . . ."

Due process is denied if a justice of the peace is required to decide between his own compensation and justice.

This court's reliance upon *State v. Gonzales*, 43 N. M. 498, 95 P. (2d) 673, is misplaced because the New Mexico court

---

[3]*State v. Schelton*, 205 Ind. 416, 186 N. E. 772 (1933); *Harding v. Minas*, 206 Ind. 661, 190 N. E. 862 (1934).

[4]10 Ind. L. Jour. 320, 321.

in words said that it did not decide the question which this court claims was decided.

The only point decided was that the question was not presented for decision because it was never raised before the justice of the peace and was urged first upon appeal.

*Gavagan v. Marshall,* 160 Fla. 154, 33 So. (2d) 862, does not support the court's conclusion. In fact, the question now before us was not even presented. That case involved only a claim by a justice of the peace for compensation for performing an inquest. The statutory law of Florida required approval by the judge or the prosecuting attorney or a trial court having felony jurisdiction before the inquest was performed. The county's liability for the inquest was denied by the county commissioners, and the justice of the peace sought to force payment by mandamus. This, however, the court denied because of the failure of the justice of the peace to obtain the prior official approval. It did, however, comment:

" . . . It is well recognized that when one has a pecuniary interest in a determination of a matter that he is not as impartial as he would be if he had no such interest. See *Tumey v. Ohio,* 273 U. S. 510."

The true position of the State of Florida on the fee system is reflected by the decision of the Florida Supreme Court in *Rollo v. Wiggins, supra,* in which a municipal judge, whose compensation of one dollar depends upon conviction, was prohibited from trying a person for a minor offense. The argument was the same as advanced by the court in this case, that the matter was too small to be of consequence. The view of that court was expressed in the following excerpt from its opinion:

"In the instant case the amount of the fee involved is small, being only one dollar in each case which makes the aggregate of five dollars for the five cases if the plaintiff be convicted in each case. One dollar, however, is only relatively a small amount. One dollar has more allure for one man than ten dollars may have for another. Therefore, if it be for a sound rule that a judge is disqualified when it appears that he reaps a large pecuniary stipend, if and when a cause before him is decided in favor of one party,

but reaps nothing if the other party prevails, it appears logical that he would be equally disqualified if there is any pecuniary gain for him depending on the disposition of the cause.

"The question is not what the effect may be on the conduct of any particular judge, but what the effect may be upon one who may easily yield to the temptation to feather his pocket even with a few extra dollars. If in a civil case it should be provided that in the event of the determination of the cause in favor of one party the judge should be paid a certain cash fee, but in the event the disposition should be in favor of the other party the judge would receive nothing, no self-respecting judge would consent to sit in judgment therein and therefore, we have been confronted with no such condition in any case."

While the payment of justices of the peace by fees was abolished in Ohio by amended senate bill No. 319, 1955 Laws of Ohio, p. 276, the office of justice of the peace itself continued until January 1, 1958, when Ohio totally abolished it and replaced it with a salaried county court system which, after 1963, will be benched only by trained lawyers. Ohio Rev. Code, §§ 1907.011 to 1907.991.

It is without significance that the Washington State Constitution by Article IV, § 13, authorizes legislation to compensate justices of the peace by fees while prohibiting it for all other judicial officers. The sole issue is whether the scheme is prohibited by the fourteenth amendment to the United States Constitution.

It matters not whether that method is created by the state  constitution or by statute, for in either event it is void. A state statute and a state constitution with respect to a right claimed under the federal constitution are not different.

Clause 2 of Article VI of the federal constitution is as follows:

"This Constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any state to the contrary notwithstanding."

In a long line of cases, the Federal Supreme Court has held that a right arising under the federal constitution can no more be impaired by a state constitution than by a state statute because both are laws within the meaning of the federal constitution. *Guinn v. United States*, 238 U. S. 347, 59 L. Ed. 1340, 35 S. Ct. 926; *Russell v. Sebastian*, 233 U. S. 195, 58 L. Ed. 912, 34 S. Ct. 517; *Fisk v. Jefferson Police Jury*, 116 U. S. 131, 29 L. Ed. 587, 6 S. Ct. 329; *New Orleans Gas Co. v. Louisiana Light Co.*, 115 U. S. 650, 29 L. Ed. 516, 6 S. Ct. 252; *Railroad Co. v. McClure*, 77 U. S. 511, 19 L. Ed. 997.

We have here not a disqualification by direct pecuniary interest, but a disqualification by prejudice arising from indirect pecuniary interest. The distinction is:

"  . . .  The smallest pecuniary interest is  . . .  a bar to the justice acting, but where the interest is not pecuniary the question arises whether the interest is of such a substantial character as to make it likely that he has a real bias in the matter.  . . ." 25 Halsbury's Laws of England (3rd ed.) 132, § 239.[5]

But due process is denied in both instances because the tribunal is not impartial. In *In re Murchison*, 349 U. S. 133, 136, 99 L. Ed. 942, 75 S. Ct. 623, it is said:

"A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness. To this end no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome. That interest cannot be defined with precision. Circumstances and relationships must be considered. This Court has said, however, that 'every procedure which would offer a possible temptation to the average man as a judge  . . .  not to hold the balance nice, clear and true between the State and the accused, denies the latter due process of law.' *Tumey v. Ohio*, 273 U. S. 510, 532. Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally be-

---

[5]The first edition is cited in *Tumey v. Ohio, supra*, 19 Halsbury's Laws of England (1st ed.) 552, § 1156.

tween contending parties. But to perform its high function in the best way 'justice must satisfy the appearance of justice.' *Offutt v. United States,* 348 U. S. 11, 14."

This court itself said as much in *State ex rel. Barnard v. Board of Education of Seattle,* 19 Wash. 8, 52 Pac. 317:

" . . . The principle of impartiality, disinterestedness, and fairness on the part of the judge is as old as the history of courts; in fact, the administration of justice through the mediation of courts is based upon this principle. It is a fundamental idea, running through and pervading the whole system of judicature, and it is the popular acknowledgment of the inviolability of this principle which gives credit, or even toleration, to decrees of judicial tribunals. Actions of courts which disregard this safeguard to litigants would more appropriately be termed the administration of injustice, and their proceedings would be as shocking to our private sense of justice as they would be injurious to the public interest. The learned and observant Lord Bacon well said that the virtue of a judge is seen in making inequality equal, that he may plant his judgment as upon even ground. Caesar demanded that his wife should not only be virtuous, but beyond suspicion; and the state should not be any less exacting with its judicial officers, in whose keeping are placed not only the financial interests, but the honor, the liberty and the lives of its citizens, and it should see to it that the scales in which the rights of the citizen are weighed should be nicely balanced, for, as was well said by Judge Bronson in *People v. Suffolk Common Pleas,* 18 Wend. 550:

" 'Next in importance to the duty of rendering a righteous judgment, is that of doing it in such a manner as will beget no suspicion of the fairness and integrity of the judge.'

"The reason that financial interest or near relationship to a litigant is held to be sufficient to recuse a judge is that it is to be presumed that self-interest or natural affection will unconsciously prejudice a judge, and deprive the litigant of a fair trial. This presumption in certain cases may or may not be justified by the truth, but so solicitous is the law to maintain inviolate the principle that every litigant shall be secure in his right to a fair trial that he is accorded the benefit of the presumption. . . . "

The income of the fee justice of the peace depends directly upon the volume of cases filed. If no cases are filed, he receives nothing. Vice inheres in the system. That under

this scheme there is a very real likelihood of bias is demonstrated by the published studies of the law's scholars both here and in England.

The great historian of the law, Sir Frederick William Maitland, in his Constitutional History of England, said:

" . . . A great deal of our legal history is to be explained by the fact that for centuries the judges were paid by fees; more business therefore meant more money, and they had a keen interest in attracting cases to their courts." Maitland, Constitutional History of England, 135 (1908).

The Honorable Henry Tilton Lummus, a justice of the Supreme Court of Massachusetts from July 27, 1932, until his resignation October 1, 1955, in his work entitled "The Trial Judge," declared:

" . . . The fee system, although the amount of fees be not dependent in terms upon the result, tends to impair judicial integrity. Police and prosecutors can punish a justice of the peace who discharges defendants whom they wish to convict, by failing to bring cases before him. . . . Judicial independence is as necessary in lower courts as in others, and is to be had in precisely the same way." Lummus, The Trial Judge, 77, 80.

The dean of American scholars of procedural law, the late Professor Edson R. Sunderland[6] of the University of Michigan Law School, in a study entitled "A Study of the Justices of the Peace and Other Minor Courts," 21 Conn. Bar Jour. 300, 331, 333, and, also, Fifteenth Annual Report of the Judicial Council of Michigan (1945), stated his view as follows:

"The primary evil resulting from the fee system is the pressure it exerts on each justice who operates under it to get more business in order to enlarge his income.

"This struggle to increase his business may take the form of encouraging litigation in his court of controversies which otherwise might never get into courts at all. . . .

" . . . Most criminal complaints are made by officers exercising police powers. These officers naturally seek convictions, and would be expected to patronize justices who

---

[6]For a review of the life and work of Professor Sunderland, see 58 Mich. L. Rev. 1-54 (November, 1959).

aid them in their efforts rather than those who insist too rigidly upon protecting the rights of the defendants. A sympathetic attitude toward the views of the police is therefore quite likely to result in more business and an increase in the justice's income.

"It is very common in all states where justices of the peace compete for business, to find instances where the sheriff's office, or the state police, or any other agency engaged in enforcing the criminal law, take most or all of their cases to certain justices notwithstanding the fact that other justices may be more conveniently accessible. In such cases it is difficult not to conclude that the favored justice renders service acceptable to the officers who bring in the business. . . ."

In Warren, Traffic Courts, 211, 214, it is said:

"Despite these occurrences and notwithstanding isolated cases of huge earnings such as $2,800 in one month 'in season' and $4,553 in thirteen months from one 'traffic light,' justices of the peace in over 90 per cent of the cases do not find fees lucrative. Attempts to swell the normal revenue of this office by either improperly enlarging the costs or expanded business is unquestionably an indictment of the fee system. However, for the purpose of emphasis it is repeated that the real viciousness of the fee system arises not from the possibilities it offers for unscrupulous revenue, but from the psychological attitude it engenders; namely, a conscious or unconscious prejudice where the testimony is at best evenly balanced. Such a frame of mind subtly eliminates the legal safeguard which requires evidence of guilt beyond a reasonable doubt before a person can be convicted of a crime. It falls most heavily upon the accused who, having pleaded not guilty, is entitled to the presumption of innocence."

Dean George Neff Stevens of the University of Washington school of law in his study entitled "Washington State Courts with Criminal Jurisdiction: The Law and Some Problems" (1957), stated his conclusions in the following paragraph:

"Since unsalaried justices of the peace are compensated from the fees (note and distinguish—but not from the fines they collect), the volume of their business determines their income. . . . Let us suppose, as some members of the Magistrate's Association have charged, that traffic cases

tend to be taken before those justices of the peace who tend to convict rather than before one of the two nearest justices of the peace in incorporated cities and towns nearest to the point of violation, as required by R.C.W. 46.52.100, when either or both of these justices of the peace happen to be, let us say, procedural minded, or require more detailed proof of a violation than some other justice might demand. Since traffic cases are one of the most important sources of legal business, and whether there be some truth or only a wide-spread belief in the above supposition, the justice of the peace is under a real, or imaginary but none the less important, urge to cooperate with the state patrol if he is interested in making a living as a justice of the peace. . . . " Stevens, Washington State Courts with Criminal Jurisdiction: The Law and Some Problems, 5.

Recently the legislative council of Washington, in its study of the matter, found a wide fluctuation of income among competing fee justices. In a town of 2,600 people, one justice of the peace heard 1,244 criminal cases and collected $3,928 in fees in the calendar year 1959, while another justice of the peace in the same town heard two cases and collected $2. In other towns, there were variations from $1,182 to $20; $1,027 to $344. In one town in which there were three justices of the peace, one collected $7,726 in fees in criminal cases, while the other two received nothing. Newspaper surveys report justices of the peace collecting an annual booty in excess of the salaries of the judges of this court.

In 43 Journal of the American Judicature Society 111, December, 1959, in an editorial entitled "Payola in Court," it is reported that a succession of state policemen in New Mexico testified they had received twenty to thirty dollar gifts in cash from justices of the peace to induce them to file charges before those justices.

Similar conclusions have been reached by the studies of laymen.[7]

---

[7]Upon the fee system of compensating public officials in Georgia in 9 Mercer L. Rev. 231, 233, note 7, Professor D. Meade Field and Charles J. Driebe commented:

" . . . When the ordinary operates the traffic court on a fee basis, there is a great temptation not only to administer the law too eagerly but to create speed traps. The office of justice of the peace is

We are concerned only with nonsalaried rural justices of the peace.[8]

The framers of the constitution in our frontier society of seventy-one years ago realized the viciousness of the fee system, because in Article IV, § 13, of the constitution, all judicial officers except justices of the peace were prohibited from collecting fees.

By the constitutional amendment of 1952, even justices of the peace except in rural areas were likewise prohibited from receiving fees. The constitutional mandate in amendment 28 is:

" . . . In incorporated cities or towns having more than five thousand inhabitants, the justices of the peace shall

particularly subject to the abuses outlined herein, and much of the activity of arresting and deciding officials may be unconstitutional; . . ."

Speed traps were first outlawed in 1927, Laws of 1927, chapter 309, § 7, p. 776. The present statute is RCW 46.48.120; Laws of 1937, chapter 189, § 74, p. 891.

J. Van B. Coe, in his study entitled "A Study of the Justice of the Peace in Onondaga County" (1931, New York), declared:

" ' . . . The state does not wish duplicated the condition in a certain town in this county, where considerable money in fees is paid to the Justice and Constable with practically no return in fines. A justice, unless he keeps in mind these facts concerning the troopers, cannot hope to do much business with them. On the other hand, a justice who will keep these facts in mind will be rewarded by having the troopers bringing their cases to him whenever possible, rather than to another justice of whom they are not so certain.' . . ." Warren, Traffic Courts, 218, note 1.

"The above-mentioned work is a thorough investigation by personal interview of 75 justices in a county of New York State and comprises a thesis accepted by the University of Syracuse, Maxwell Graduate School of Citizenship and Public Affairs, in partial fulfillment of requirements for the degree of Master of Arts. . . ." Warren, Traffic Courts, 194, note 4.

The same abuses were found to exist in a survey published in the Saturday Evening Post of October 11, 1958, entitled "The 'JP': Should He Be Abolished?"

[8]The only qualification required of a rural justice of the peace is that he be a citizen and an elector of the precinct.

" . . . No legal or other qualifications—other than the usual age stipulations—are required by any of the states. Louisiana is the only exception to this, and its meager requirement is that a justice must be able to read and write. . . ." 29 Notre Dame Lawyer 438, 439.

receive such salary as may be provided by law, and shall receive no fees for their own use."

Moreover, since 1951, all justices of the peace in cities and towns having a population in excess of five thousand must be lawyers admitted to practice in this state. RCW 3.12.071; *In re Bartz*, 47 Wn. (2d) 161, 287 P. (2d) 119.

We are confronted, then, with a system in which the income of the unsalaried justice of the peace is utterly dependent upon the whim and caprice of the arresting officers. Such was one of the grievances enumerated against George III in our Declaration of Independence:

"He has made judges dependent on his will alone for the tenure of their offices, and the amount and payment of their salaries."

Likewise, the Magna Carta declares:

"To no one will we sell, deny, or delay right or justice."

In a frontier society, difficulties of travel and distance afforded a basis for excluding remote areas from the constitutional prohibition against fee justices in communities of more than five thousand population;[9] but with the advent of the automobile and superhighways, those reasons no longer exist,[10] and the objection of the cost is invalid

---

[9]"What is the occasion for justices of the peace today? Chief Justice Charles Loring of Minnesota has expressed the conclusion that justice courts were adapted to primitive conditions and were only justified when travel was slow and difficult. We are now living in a time when 'slow and difficult' travel conditions have fallen into a realm of history that is rapidly being forgotten. The Illinois farmer, or farmer's wife, who makes one or perhaps several motor trips per day for the family milk, butter, eggs, meat, and vegetables at the town super-market or locker plant, and then drives to the consolidated high school perhaps in another county to see son James play basketball in the evening, no longer requires the services of a township justice of the peace a mile down the road. . . ." 1952 U. Ill. L. F. 480, 483.

[10]". . . But today with paved roads, automobiles and instant communication, all of which obtain, with but few exceptions, in the remotest rural communities, it is safe to say that the conditions which forced the creation and spread of the justice of the peace system in the United States have long since ceased to exist." 15 Cal. L. Rev. 118.

"In our system today the original reasons for the justice of the peace have long since vanished. Now the once beneficial role of these inferior courts has almost completely degenerated. As yet, our judicial reform

under any circumstances.[11]

That there are unsalaried justices of the peace in Washington who are not influenced by the prospect of loss of business cannot be controlling. The difficulty lies not with the integrity or capability of the past, present or future justices of the peace, but with the system which compels men to choose between their own financial advantage and justice. Conflicts of interest laws outlaw such temptations

has not caught the elusive justice of the peace, and consequently the vestigal organ of the J.P. courts remains to harass our judicial system." 29 Notre Dame L. Rev. 438.

[11]". . . This latter method also holds down the size of the bill which the county treasurer eventually pays him. This is a sensible thing to hold down because some day a curious person with a proclivity toward reform might add up the total cost to the country of maintaining the justice of the peace system and conclude that a half a dozen municipal, or salary-compensated courts, benched by men learned in the law, could be substituted at less expense. This knowledge, if it became widespread, might be dangerous, lobby or no lobby. . . ." 23 Jour. Am. Jud. Soc'y 221, 222.

"The fee system of compensation to public officials is one of the most corrupting influences in our entire political system. It blights whatever it touches. The judge must favor his friends who bring him the business. Justice must give hostages to fortune. Not only so, but unscrupulous magistrates will send out their deputies and constables to bring in business; . . .

". . . But with the excessive number of justices of the peace, all dependent upon the fees of office for their livelihood, we have competition and rivalry. . . .

"The fact that petty judges are needed in rural communities remote from county seats, and that it would be too expensive to employ trained judges for such small constituencies has to some persons seemed a reason for retaining our present system, modified only in the larger urban centers. But fortunately with telephones and good roads and other facilities for rapid communication now wide-spread and wellnigh universal, our counties have become very small. Today it is about as easy to traverse an entire county as it was to traverse a civil district a few generations ago. . . ." 9 Tenn. L. Rev. 1, 14, 15, 18.

". . . The magistrate, taking a certain amount of time from his everyday work to dispense occasional justice among his neighbors, and paid for so doing by fees, was adapted only to sparsely settled and pioneer or rural communities and is an anachronism." Pound, A Generation of Improvement of the Administration of Justice, 22 N.Y.U. L.Q. Rev. 369, 385.

on the ground of sound public policy.[12] The test is whether this enticement inheres in the system. It does. On the one side, the justice of the peace is tempted to enhance his income by doing the bidding of arresting officers; on the other, he must decide impartially in each case. No more is required to demonstrate a very real likelihood of bias. It is the constitutional right of every person, in rural areas as well as in urbanized communities with over five thousand people, to be tried by justices of the peace as impartial as the law can devise.

The argument that if an accused person insists upon due process he may have it by taking an appeal which will be heard *de novo* overlooks the state's obligation to furnish an impartial tribunal in the first instance.

That argument would support the Pennsylvania practice so strongly condemned by the Allegheny County grand jury (1938) in which justices of the peace instigated groundless prosecutions solely for the purpose of collecting fees. Warren, Traffic Courts, 214.

Due process requires a trial before an impartial judge in the first instance or before a jury presided over by an impartial judge.[13] The Supreme Court of West Virginia in

---

[12]See RCW 42.22.030:

"No officer, employee of a state agency, legislative employee, or other public official shall have any interest, financial or otherwise, direct or indirect, or shall engage in any business or transaction or professional activity, or shall incur any obligation of any nature, which is in conflict with the proper discharge of his duties in the public interest."

See, also, Conflict of Interest & Federal Service, by the Association of the Bar of the City of New York, Special Committee on the Federal Conflict of Interest Laws, p. 3, where it is said:

"A conflict of interest does not necessarily presuppose that action by the official favoring one of these interests will be prejudicial to the other, nor that the official will in fact resolve the conflict to his own personal advantage rather than the government's. If a man is in a position of conflicting interests, he is subject to temptation however he resolves the issue. Regulation of conflicts of interest seeks to prevent situations of temptation from arising. . . ."

[13]". . . It is difficult, however, to understand how such a privilege, even if exercised, would protect the defendant from a partial tribunal. The justice, like any other judge, would still be the presiding officer of the court, with the same powers to instruct the jury, decide

*Williams v. Brannen,* 116 W. Va. 1, 178 S. E. 67, so held:

"Counsel would avoid the maxim on the grounds that the accused may have a jury instead of the magistrate to try him, and that the accused has the unrestricted right of appeal. Both of those grounds are unsubstantial. 'Trial by jury,' in the constitutional sense, requires such a trial to be under the superintendence of a disinterested judge. *Traction Co. v. Hof,* 174 U. S. 1, 13-14, 19 S. Ct. 580, 43 L. Ed. 873. It is ordinarily cheaper to pay a moderate fine than to pay the expenses attendant upon an appeal. For which reason many an innocent man has submitted to an unjust decision in an inferior court. Right of appeal does not meet the situation. The Constitution requires that the accused shall be tried before a fair and impartial tribunal in the first instance where he will not face the alternative of paying an unjust fine or of resorting to the delay, annoyance and expense of an appeal."

Accord: *Roberts v. Noel, supra.*

The court holds that, because the accused did not seek a change of venue to a salaried justice of the peace, he waived his right to challenge the constitutionality of the fee method of compensating justices of the peace. I disagree. The decision is no more than that those who insist upon a trial before an impartial judicial officer can have it if they ask for it and pay an additional two dollars. But the great bulk of the people will still be victims of this unconstitutional system, and such justices of the peace will continue to enjoy their booty even if a change of venue is taken to an impartial court.

The state is under an absolute obligation to provide an impartial tribunal in the first instance. Moreover, in order to obtain the transfer of the case against him, Borchert

---

on admissability of evidence, and rule on motions. This is certainly not due process in any sense of the phrase.

". . . There is more merit to this distinction than any other asserted by the court; nevertheless, the complete effect of such procedure is to force a defendant to try his case twice to get justice at the hands of a wholly impartial tribunal. This is a severe handicap upon the defendant who has neither the necessary time nor money with which to perfect the appeal and retrial of his case. Surely a satisfactory system of justice cannot sanction the placing of such a burden on the defendant." 10 Ind. L. Jour. 320, 322.

would be obliged to pay a fee of two dollars because RCW 3.16.070 explicitly so requires:

" . . .

"The sum of two dollars shall be paid by the party taking the change of venue to the justice to whom the case is transferred: . . ."

This collides headlong with the specific guarantee in the Bill of Rights. Amendment 10 of the state constitution provides:

" . . . In no instance shall any accused person before final judgment be compelled to advance money or fees to secure the rights herein guaranteed."

The justice courts benched by legally trained salaried justices of the peace were open and accessible at the time the charges were filed against Borchert. There was no emergency. Had such charges been filed in one of the available courts of a salaried justice of the peace, this case would not be here. The arresting officers by statute have the right to select the justice of the peace. The state's agents selected a fee justice of the peace when the courts of salaried justices of the peace were available.

No explanation is offered for this weird choice. It must be remembered that, even if the case were transferred to a salaried justice of the peace, the fee magistrate still retains his fees. Excessive numbers of such officials surrounding the metropolitan centers of the state, all competing for the favor of the arresting officers, create an intolerable situation. Inherently there is a very real likelihood of bias in favor of the arresting officers and against the accused. Indeed, conviction for conspiracy between such a fee magistrate and the constabulary was sustained by the Supreme Court of Illinois in *People v. Braun*, 375 Ill. 284, 31 N. E. (2d) 287 (1940).

The situation prevailing here is much worse than that condemned by the highest court in Kentucky in *Roberts v. Noel, supra*. That court said:

" . . . To say, as we did in the Slavin case, that the right to trial by a judge free from prejudicial influences may be waived, is unrealistic for, as pointed out in Ex parte

Baer, D. C., 20 F. 2d 912, the ordinary person is not aware of his right to object to the jurisdiction; he assumes that the court before which he has been taken is a lawfully constituted one."

I would affirm the judgment.

Donworth and Rosellini, JJ., concur with Foster, J.

Finley, C. J. (dissenting)—RCW 3.16.070 designates fees which are retained by justices of the peace *as personal income* from the operations of a justice of the peace court. These include a fee of fifty cents for a commitment to jail and one dollar for a transcript of a judgment of conviction. (RCW 10.10.040 requires a transcript of the judgment of conviction in appeals to the superior court.) Not every conviction by a justice of the peace results in his collecting, and adding to his personal income, the provisional fees mentioned above.[14] However, it is obvious that neither of these provisional fees will be obtained unless an accused is convicted by the justice of the peace. I am convinced this fact (the potential for increased compensation, available upon conviction) is most significant. It and the factor that, under the *existing fee system*, the number of cases filed and submitted to a particular justice of the peace—and his personal income therefrom—may be controlled and determined by the cooperation of law enforcement officers (whose interest in convictions is understandable, but may be ill advised) go a long way in bringing the instant case within the scope of *Tumey v. Ohio* (1927), 273 U. S. 510, 71 L. Ed. 749, 47 St. Ct. 437, 50 A. L. R. 1243. The decision in the *Tumey* case is referred to in the majority opinion and discussed at length in Judge Foster's dissent. Its reasoning is eloquently persuasive. The policy principle and the de-

---

[14]RCW 3.16.070 also provides for a filing fee of $2.00, a $.50 fee for issuing warrants, and a fee of $.75 for taking recognizance of bail. These fees, totaling $3.75, are acquired, if at all, without regard to the outcome of the case. If a criminal defendant is acquitted, these fees may be recovered from the local county, city or town (RCW 10.46.210); if the defendant is convicted, the costs are collected directly from him as a part of the judgment (RCW 10.04.110) and retained by the justice of the peace (RCW 3.16.160).

cision rendered are inherently right. We should follow its reasoning forthrightly. We should adopt its enlightened policy principle as an integral and essential part of the judicially annunciated, and *judicially enforced*, basic criminal due process protections accorded to every accused individual who is prosecuted for any offense anywhere, any time, in any court operating under the constitution and the laws of this state.

It should not be avoided, but kept clearly in mind that if the *Tumey* case (*supra*) applies, and I am convinced it does, then for the reasons stated herein the decision of a majority in the instant case is clearly not supportable, and it is unquestionably subject to reversal upon a review by the United States Supreme Court.

Respondent was taken before the justice court authorized for and established in Glocca Morra precinct. This precinct is adjacent to the north end of Lake Washington and the highways that serve traffic in that area. It is located in King County, just north of the Seattle city limits. A survey, made by the state court administrator, working with the judiciary subcommittee of the interim legislative council, a part of the legislative branch of our state government, produced detailed reports of the operations of rural justices of the peace. These reports are public documents and official records which can be judicially noticed. *Carolene Products Co. v. United States* (1944), 323 U. S. 18, 89 L. Ed. 15, 65 S. Ct. 1, 155 A. L. R. 1371; *Adams v. Bolin* (1952), 74 Ariz. 269, 247 P. (2d) 617, 33 A. L. R. (2d) 1102; *Florida Accountants Ass'n v. Dandelake* (Fla. 1957), 98 So. (2d) 323, 70 A. L. R. (2d) 425; *Southern Cotton Oil Co. v. Anderson* (1920), 80 Fla. 441, 86 So. 629, 16 A. L. R. 255; *Wisconsin Ornamental Iron & Bronze Co. v. Wisconsin Tax Comm.* (1930), 202 Wis. 355, 229 N. W. 646, 233 N. W. 72; Currie: Appellate Courts Use of Facts Outside of the Record by Resort to Judicial Notice and Independent Investigation, 1960 Wisconsin L. Rev. 38. The pertinent report shows that. during the calendar year of 1959,[15] a total of 2,528 cases

---

[15]Respondent Borchert appeared before the justice court on September 2. 1959.

were filed in the justice court for Glocca Morra precinct. Of that total, 156 cases involved violations of state statutes other than traffic regulations; the remaining 2,372 cases filed were for violations of state traffic statutes. It seems significant that no civil cases were heard in that court during 1959.

As indicated by the survey reports, there are three established justice of the peace courts in the area extending from the north city limits of Seattle to the north boundary of King County (a distance of about three miles), and extending from the western extremity of King County to the incorporated municipality of Bothell (approximately eight miles). The other two justice courts in the area reported that no cases, either civil or criminal, were filed therein during 1959. It is perhaps worthy of note that one of the two justice courts in which no cases were filed is in a precinct adjacent to U. S. Highway No. 99, the main thoroughfare north from Seattle.

RCW 46.52.100, relating to *violations of state traffic laws*, states, in part, that

"Venue in all justice courts shall be before one of the two nearest justices of the peace *in incorporated cities and towns* nearest to the point the violation allegedly occurred: *Provided*, That in counties of class A and of the first class such cases may be tried in the county seat at the request of the defendant." (Italics mine.)

(The provision applies to King County; RCW 36.13.090.)

RCW 46.52.100 is a restriction upon the broader provisions of RCW 3.20.131,[16] in that it requires that persons violating state traffic laws must be charged in one of the two nearest incorporated cities or towns. RCW 46.52.100 clearly applies, and, just as clearly, was not complied with by the justice of the peace and law enforcement officers in 2,372 specific instances in 1959. This statistic, though not direct and positive evidence, should classify as circum-

---

[16]"All criminal actions before justices of the peace shall be brought before either of the nearest two justices of the peace to the place where the alleged violation occurred, or upon request of the defendant before a justice of the peace of the county seat."

stantial, and on any scale of measurement as to probative value should be strongly suggestive or incriminating as to personal bias and prejudice.

The majority take the position that respondent's waiver of his right to be tried in the county seat (*i.e.*, Seattle, by a salaried justice of the peace) was a waiver of all objections to being tried in Glocca Morra precinct. I do not agree.

It is true that respondent was offered an opportunity to have his case transferred from the justice court in which he was about to be tried to a justice court at the county seat (city of Seattle); furthermore, that respondent declined the offer. In some contexts certain rights, unless reasonably and seasonably asserted, are deemed waived. However, in the instant situation, the right to be tried before a court which is above reproach on grounds of bias or personal interest is so fundamental to the ideals of Anglo-American law and to any pertinent definition of justice, that I cannot in good conscience subscribe to the waiver argument of the majority opinion. In fact, I would classify absence of personal bias and personal interest as a *sine qua non* of the judicial administration of justice. I cannot compromise these views and my conscience to say that respondent waived this fundamental right and was foreclosed from collaterally attacking his conviction.

The reports obtained by the court administrator indicate that, during the entire year of 1959, law enforcement officers filed no criminal charge in any justice court in King County north of Seattle, except in the court of Glocca Morra precinct. There may well be a proper and acceptable explanation for this. But the record in this case is in this respect conspicuously silent. The report of the justice court operations in Glocca Morra shows that law enforcement officers filed an average of almost 6.5 traffic violation cases each day. Thus, based upon the statistics available, it would seem (whether or not admitted expressly by the officers or by the justice of the peace) that officers consistently by-passed the other justice courts in the area and refrained from filing cases at the county seat, but did file a volume of cases with the court that convicted re-

spondent. As the result of the large volume of cases, the relatively small fees per individual case retained by the justice of the peace in Glocca Morra precinct in 1959 totaled over $6,000. The neighboring justices, of course, had no fees whatever from cases filed.

The research and the statistics alluded to in the dissent by Judge Foster are most persuasive (a) that fee justice courts are not consonant with modern social needs, (b) that their operations are inconsistent with acceptable modern standards of judicial administration, and (c) that experience in other states and in countries other than our own counsels strongly against continuance of the fee justice court system. This research and the statistics, obviously, do not relate specifically to the operations of the Glocca Morra justice court. However, as mentioned hereinbefore, one of the reports obtained by the court administrator of the state courts *specifically covered operations of the Glocca Morra justice court.* There is a closer and more direct relationship between statistical information in this report and the respondent and his rights in his case now before us. These statistics, it seems to me, *specifically* support the conclusions reached in Judge Foster's dissent respecting denial of respondent's due process rights.

This, certainly is in accord with the views of the trial judge expressed in his memorandum opinion, in part, as follows:

" . . . Under the statutes of this state, the temptation to tip the balance in favor of the state is nourished not only by the opportunity to double the fee but also by the knowledge that the entire source of revenue can be cut off at the whim of the arresting officer. It is true that the amount of money involved in a single case is small. However, the public records of this county demonstrate that these small fees may total a very large sum of money annually in those justice courts which are chosen . . ."

It is significant and somewhat disturbing, if not surprising, that the express direction of RCW 46.52.100 has been so disregarded by law enforcement officials, and that this disregard for the law apparently has been condoned by the

Glocca Morra justice of the peace court. In the face of the command of both the federal constitution and our state constitution that accused persons be afforded due process of law, it is not enough, under the facts in this case, to say that respondent had a right to have his case transferred to a court in the county seat, and that he was invited to exercise this right. Evidenced here is a consistent pattern of evasion of a statutory command that alleged traffic violators be charged in a nearby city or town. In order to avail himself of the benefit of his right to have his case transferred out of a court, which the judge and the arresting officer knew had, originally, no authority to try him, the accused would have had to submit to inconvenience caused by intentional disregard of statute; and, further, the accused would, if convicted in the second court, have had to pay to it a fee of $2.00 for the change of venue (RCW 3.16-.070). The fact that the defendant, if acquitted by the court to which the cause was transferred, would not have to pay the additional charge (RCW 10.46.210) is immaterial. The guilty, as well as the innocent, are entitled to due process.

There is no denying that Art. IV, § 13, of the Washington Constitution, authorizes the legislature to establish a fee justice court system in our state. But it must also be recognized that, in addition to the provisions of the fourteenth amendment to the federal constitution, Art. I, § 3, of the Washington Constitution provides that "no person shall be deprived of life, liberty, or property, without due process of law." The problem in this case is presented to us for decision in a judicial forum, rather than a legislative one. Essentially, the decision of this state court of last resort is applicable to the particular respondent in this particular case. This, I think, is important. There are, of course, many fee justice courts in this state whose operations undoubtedly are above reproach on due process grounds. I am not now prepared to say that the due process requirement is totally incompatible with the fee justice system. But, conversely, neither statutory nor constitu-

tional authorization for a fee justice system authorizes such a system or an individual court thereof to function without regard to due process principles. In the instant case, we have a situation in which (1) a justice of the peace who convicts an accused may receive additional fees which he cannot receive without a conviction; (2) a number of justices of the peace in a small area in order to receive income from the filing of criminal cases (the survey cited earlier reveals that the bulk of cases heard by rural justices of the peace are criminal) may have to compete for the good will or cooperation of law enforcement officers;[17] (3) police officers and the Glocca Morra justice court have, in a very substantial number of cases, ignored RCW 46.52-.100, and may thereby have imposed unreasonably upon defendants an inconvenience and potential additional cost in order to enjoy their right to be tried elsewhere.

I am convinced the foregoing analysis supports the conclusion reached by the trial court that respondent has been denied due process of law. I must reject as unrealistic and entirely too theoretical and technical any explanation that respondent lost his right to object to the denial of due process by declining a change of venue. I believe the judgment of the trial court discharging respondent should be affirmed.

---

[17] It requires more naivete than I can muster to believe that police officers who feel that they have apprehended a guilty person would not, when allowed freedom of choice, be more likely to select a justice of the peace who is prone to convict.