McKinley BROWN, Etc.,
Plaintiff–Appellant,

v.

T. A. VANCE, Etc., et al.,
Defendants–Appellees.

Mary Jean BOONE, Etc., Plaintiff–Appellant, Cross–Appellee,

v.

Walter L. DENNIS, Etc., et al., Defendants–Appellees, Cross–Appellants.

No. 78–3225.

United States Court of Appeals,
Fifth Circuit.

Jan. 30, 1981.
Rehearing and Rehearing En Banc Denied
March 18, 1981.

Barry H. Powell, Jackson, Miss., Charles H. Ramberg, Brandon, Miss., for plaintiff–appellant.

Giles W. Bryant, Sp. Asst. Atty. Gen., William A. Allain, Asst. Atty. Gen., Jackson, Miss., Lyon, Crosthwait & Terney, Champ Terney, Indianola, Miss., Thomas E. Childs, Jr., Fulton, Miss., for defendants–appellees.

Before WISDOM, RONEY and HATCHETT, Circuit Judges.

WISDOM, Circuit Judge:

These consolidated class actions challenge the statutory fee system for compensating justice court judges (justices of the peace)[1] in the State of Mississippi.[2] *Brown v. Vance* involves criminal cases; *Boone v. Dennis* involves civil cases.[3] The plaintiffs concede that the pertinent statutes are constitutional on their face, apparently because the judges are paid regardless of the outcome of the cases. They contend, however, that the system is unconstitutional, as applied, for lack of due process. A judge's compensation depends on the number of cases filed in his court. The plaintiffs allege that police officers favor "convicting judges"; collection agencies and other creditors favor judges who tend to decide in their favor. The system, therefore, according to the plaintiffs/appellants, produces a temptation to the average man as a judge to favor conviction in criminal cases and judgment for the plaintiffs in civil cases.

The district court held that the plaintiffs had failed to carry the burden of overcoming the presumption of honesty and integrity in those serving as adjudicators. On appeal, the plaintiffs/appellants abandon their state–wide attack in *Brown*; they maintain, however, that they met their bur-

---

1. As used this opinion, "judge" refers to a justice court judge. Prior to the adoption of the amendment to Article 6, § 171, Mississippi Constitution 1890 (Miss.Laws, 1975, Chpt. 518, HCR 11) in 1975 the presiding officers in this lower court system were designated as justices of the peace. Pursuant to the constitutional amendment these officials are now designated as justice court judges and are referred to herein as such.

2. The plaintiffs originally sought declaratory relief adjudicating that criminal trials before lay–judges in the justice of the peace court system were a denial of due process of law. See Ashman & Lee, "Non–Lawyer Judges: The Long Road North", 53 Chicago–Kent L.Rev. 565 (1977); Note, "Is a Trial Before a Non–Attorney Judge Constitutional?", 57 Neb.L.Rev. 233 (1978). On motion of the defendants, the district court held the trial in abeyance pending the disposition of *North v. Russell*, 1976, 427 U.S. 328, 96 S.Ct. 2709, 49 L.Ed.2d 534. That case involved the constitutionality of the Kentucky two–tier trial court system for misdemeanors, with a lay–judge presiding over the first trial and appeal of right to a de novo jury trial presided over by a lawyer–judge. The

Court held that the Kentucky system did not violate the due process or equal protection clauses. Accordingly, on joint motion of the parties now before us, the district court entered an Order of Partial Dismissal eliminating the challenge to the constitutionality of trial before a lay–judge.

3. In *Brown* the district court defined the classes as follows:

The plaintiff class–All persons who on or after June 4, 1971, faced criminal charges, or in the future will face criminal charges in the Justice of the Peace Courts in the State of Mississippi.

The defendant class–All Justices of the Peace of the State of Mississippi.

In *Boone* the court defined classes as follows:

The plaintiff class–All persons who on or after April 2, 1972, were sued as defendants, or in the future will be sued as defendants in civil suits in Justice of the Peace Courts in Mississippi.

The defendant class–All Justices of the Peace of the State of Mississippi.

den of proof in criminal cases in districts where two judges have concurrent jurisdiction. Hinds and DeSoto counties have such districts. On appeal the plaintiffs/appellants in *Boone* adhere to their position that the civil fee system throughout the State is unconstitutional. We reverse in part and affirm in part.

## I.

Each of Mississippi's 82 counties is divided into five districts, and a justice court judge is elected from each, except that a county having over 200,000 inhabitants may have one additional judge for each district. Miss. Code Ann. § 9–11–1. Only Hinds County, which includes the City of Jackson, and DeSoto County, just south of Memphis, have two judges for each district. Under § 171 of the Mississippi Constitution and § 99–33–1 of the Mississippi Code, justice court judges in Mississippi have jurisdiction over misdemeanors occurring in their districts. If no judge is qualified and available in the district where the violation occurred, the case can be heard by any judge in the county. *Id.* The judges have jurisdiction over all civil actions in which the amount of damages or the value of the property involved does not exceed $500. *Id.* § 9–11–9. Jurisdiction in civil cases is coextensive with the county. Venue is proper in the district where the debt occurred, where the defendant resides, or where the property is located. *Id.* § 11–9–101. Objections to venue are waived if not raised by the defendant. *Stanley v. Cruise,* 1924, 134 Miss. 542, 99 So. 376.

Justice court judges in Mississippi do not receive a salary. At the time when these suits were brought and tried a judge received $6 for each criminal case docketed and affidavit signed, regardless of the disposition of the case. *Id.* § 25–7–25. The judge received $8 in each civil case, contested or uncontested, payable by the losing party. *Id.* Additionally, each judge received $8 in civil cases for proceedings involving levy of execution on judgments and attachment and garnishment proceedings. *Id.* Since the trial of this case, the Mississippi legislature has increased the judges' compensation. Judges now receive $15 for each civil case and $10 for each criminal case. *Id.* (1979 Cum. Supp.). There is no longer any fee for postjudgment proceedings in a civil case.

At trial the plaintiffs did not limit their evidence to criminal cases in Hinds and DeSoto counties, but attacked the entire criminal fee system. They contended that in the eighty counties where there was one judge to a district officers would patrol, set roadblocks, and make arrests in districts having a high conviction rate; when officers made arrests in a district where there was a low conviction rate, the traffic tickets were often made returnable to another district.

The plaintiffs argue that most civil suits are filed by collection agencies and businesses having a heavy volume of litigation. Creditors shop for a favorable forum and choose the judge most likely to find for plaintiffs. Because judges used to receive an extra fee for certain postjudgment proceedings, they had a compound pecuniary interest in granting a judgment for the plaintiffs.

The trial judge's findings were favorable to the defendants. He found that few officers made arrest tickets returnable to a judge in a district where there was no jurisdiction. The Mississippi Commissioner of Public Safety testified that disciplinary measures are taken against any patrolmen who return tickets to a district other than that in which the violation occurred. The district court also found that the use of roadblocks and radar was not limited to districts in which judges have high conviction rates. Highway patrolmen instead used "a computerized scientific formula" based upon many factors, including prime accident and high fatality areas, high violation points, and safety factors for the officers and motoring public. Some judges continued to receive tickets even though on occasion they had found defendants not guilty or had dismissed charges. The district court rejected documentary and testimonial evidence about the disparity be-

tween fees received by judges in different districts, finding that "the genesis of this disparity is [in the] difference in highway mileage, types and classes of roads, traffic counts, accident and fatality rates, and seasonal traffic variations".

The district court found that judges transferred civil cases when the defendant raised the question of improper venue. Moreover, creditors continued to use judges who had found in favor of defendants or had entered judgment for less than the plaintiff demanded. Some forum shopping existed, but one witness testified that efficiency and judicial experience were two of the primary elements creditors considered in deciding where to file suit. Statistics submitted by the plaintiffs did not show the number or percentage of cases when venue was waived or when the cases were transferred, dismissed, or resulted in a determination in favor of the defendant. On these findings, the district court concluded that the fee system in civil actions did not violate due process.

The district judge held that due process was violated by the additional $8 fee for postjudgment proceedings involving levy of execution on judgments and attachment and garnishment proceedings. The fee gave "[a] Justice Court Judge . . . an unconstitutional pecuniary interest in favoring plaintiffs who file civil suits in his court". On cross-appeal the State argues that the district court erred in holding that the fee system for postjudgment proceedings in civil cases violates due process.

II.

In considering the Mississippi fee system the relevant constitutional fact is that a judge's bread and butter depend on the number of cases filed in his court. Traditionally, justices of the peace who handle

petty criminal cases and small claims are close to the general public and are an important, if not essential, element in any state's system of justice. And there must be many, many judges in Mississippi, as in any other state, pure in heart and resistant to the effect their actions may have on arresting officers and litigating creditors. Nonetheless, the temptation exists to take a biased view that will find favor in the minds of arresting officers and litigating creditors. This vice inheres in the fee system. It is a fatal constitutional flaw. Every accused person and every civil litigant is entitled to a trial in a system that is not only fair on its face but in practical operation is free of temptation to the trial judge to enhance his income by leaning in the direction of conviction in criminal cases and judgment for the plaintiff in civil cases. The temptation may not rise to the level to which Saint Anthony was exposed, but it exists for the average man as a judge dependent on a steady flow of filing fees for subsistence.

As has been observed, in a sense England abolished fee system courts when it established the principle in Bonham's Case, 77 Eng.Rep. 638 (K.B.1608), that a judge could not have a pecuniary interest in litigation before him, directly or indirectly. *See* Plucknett, "Bonham's Case and Judicial Review," 40 Harv.L.Rev. 30 (1930). The fee system for payment of judges' compensation has been almost universally condemned because of its direct effect, when fees depend on the outcome of cases, or its indirect effect, when it provides an incentive for judges to enhance their compensation by developing an image as a convicting judge or a creditors' judge.[4] What was a useful system in the early development of this country has become a malignancy weakening the administration of justice in the

---

4. For general discussion of compensation systems for justices of the peace, see F. Maitland, *Constitutional History of England* 135 (1968); Sunderland, "A Study of the Justice of the Peace and Other Minor Courts", 21 Conn.B.J. 300 (1948); Reynolds, "The Fee System Courts–Denial of Due Process", 17 Okl.L.Rev. 373 (1964); Note, "Limited Access to the Courts: An Appraisal of Fee Systems", 41 U.Chi.L.Rev. 841 (1974); Note, "The Fee System Courts: Financial Interest of Judges and Due Process", 31 Wash. & Lee L.Rev. 474 (1974); Note, "The Justice of the Peace: Constitutional Questions", 69 West.Va.L.Rev. 314 (1967).

courts with which most people have the most contacts.

In recent years, the trend in the states has been to pay judges on justice of the peace courts and similar courts a salary.[5] In 1962, the House of Delegates of the American Bar Association adopted the following resolution: "That the House of Delegates urge all state and local bar associations in states where the fee system for compensating judges and justices of the peace still exists, to undertake an active campaign, in cooperation with the Standing Committee on the Traffic Court Program, to eliminate the fee system". In 1974 the American Bar Association adopted and published *Standards Relating to Court Organization*. Section 1.53 provides as follows:

> 1.53 Revenues from Fines. The purpose of fines and other exactions imposed through judicial proceedings is to enforce the law and not to provide financial support for the courts or other agencies of government. All revenues from fines, penalties, and forfeitures levied by a court should be transferred to the state general fund, and should not be appropriated to the court receiving them or by a local unit of government that supports such a court.[6]

The Judiciary Commission of the State of Mississippi has not overlooked this trend. The Commission reported to the Regular Session of the Legislature of the State of Mississippi, January 6, 1970, that "The fee system for compensating both justices of the peace and constables is unsound and potentially lends itself to many abuses—even among men who are conscientious and honest.... Civil creditors, especially large businesses, are able to exert entirely too much economic pressure over a justice of the peace who must rely on court costs for livelihood".[7] Mississippi law review com-

---

5. In a 1964 law review article Reynolds, "The Fee System Courts—Denial of Due Process", 17 Okl.L.Rev. 373, the author listed twenty–five states as providing some form of fee system: Alabama, Arkansas, Colorado, Florida, Georgia, Indiana, Iowa, Michigan, Minnesota, Mississippi, Montana, Nevada, New Mexico, New York, North Carolina, Oklahoma, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Washington, and West Virginia. A recent survey by the Institute of Judicial Administration, Silberman, *Non–Attorney Justice in the United States: An Empirical Study*, NCSC (1979), shows that nine of the above–listed states now pay salaries to lower court judges, i.e., justices of the peace or equivalent judges: Alabama, Colorado, Florida, Indiana, Michigan, Tennessee, Texas, Vermont, and West Virginia. Some states have a mixed system of compensation but only Connecticut, Georgia, Minnesota, Nevada, and South Carolina have a system similar to that of Mississippi. *See also Courts of Limited Jurisdiction: A National Survey*, National Institute of Law Enforcement and Criminal Justice, Law Enforcement Assistance Administration, United States Department of Justice (K. M. Knab ed. 1977).

6. The section specifically relates to "fines and other exactions", but the commentary makes it clear that the section also applies to fees. It states: "The use of courts as revenue–producing agencies is a continuing abuse of the judicial process. It has long been recognized as unconstitutional for a judge to have his income dependent on the outcome of cases before him, but a similar result often occurs indirectly when the budget of the court in which he sits is established with reference in whole or in part to the fine revenues produced by the court. This is at present a common practice in local courts of limited jurisdiction. It should be eliminated. See *Ward v. Village of Monroeville*, 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972), *Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927)." American Bar Association Commission Standards of Judicial Administration 107 (1974).

7. The Mississippi Judiciary Commission's Report to the Regular Session of the Legislature of the State of Mississippi, January 6, 1970, includes the following statement on the justice of the peace court fee system:

 (B) *Fee System.* The fee system for compensating both justices of the peace and constables is unsound and potentially lends itself to many abuses—even among men who are conscientious and honest. The commission finds that there are substantial abuses resulting from the fee system.

 Of course, a justice of the peace should be concerned about the facts in a case, but when he knows that, if he frustrates a law enforcement officer by acquitting an accused whom the officer has arrested, he will receive from that officer no other traffic tickets on which the J.P. receives $4.00 each, it is very difficult to be entirely objective. The fee system produces this dilemma.

 Civil creditors, especially large businesses, are able to exert entirely too much economic pressure over a justice of the peace who

mentary agreed. Stark, "Constitutional Challenge in the Justice of the Peace Court in Mississippi", 44 Miss.L.J. 996 (1973) (a discussion of the cases now before us); Bunkley, "Some Observations on Our Judicial System", 26 Miss.L.J. 1 (1954).[8]

Over fifty years ago, the Supreme Court defined the basic principles that should govern this case. In *Tumey v. Ohio*, 1927, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749, the Court considered the constitutionality of an Ohio town's system of compensating its mayor for his services as judge of the mayor's court. In addition to his regular salary the mayor–judge shared directly in fees and costs assessed against convicted defendants. Chief Justice William Howard Taft, in striking down the fee system, held that a defendant is deprived of due process when judged by a person who "has a direct, personal, substantial pecuniary interest in reaching a conclusion against him in his case". 273 U.S. at 523, 47 S.Ct. at 441. The Chief Justice took direct aim at the vice in a fee system:

> There are doubtless mayors who would not allow such a consideration as $12 costs in each case to affect their judgment in it, but the requirement of due process of law in judicial procedure is not satisfied by the argument that men of the highest honor and the greatest self–sacrifice could carry on without danger of injustice. *Every procedure* which would offer a *possible temptation* to the *average man as a judge* to forget the burden of proof required to convict the defendant, *or which might lead him not to hold the balance nice, clear and true between the state and the accused* denies the latter due process of law. (Emphasis added.) *Id.* at 532, 47 S.Ct. at 444.

The next year the Court held that the *Tumey* rationale was inapplicable to another Ohio mayor's court compensation system. *Dugan v. Ohio*, 1928, 277 U.S. 61, 48 S.Ct. 439, 72 L.Ed. 784. There, however, the Mayor of Xenia received a fixed salary paid from the city treasury. Fines accumulated from his court contributed to the treasury. The Court distinguished the case from *Tumey* on the ground that the mayor received the same salary out of a general fund regardless of the outcome of cases he decided. "There is no reason to infer on any showing that failure to convict in any case or cases would deprive him of or affect his fixed compensation." 277 U.S. at 65, 48 S.Ct. at 440. The criminal defendant challenging the statute also argued that the mayor could be biased because as a member of the city commission he voted on the appropriation and spending of city funds. The Court noted, however, that a city manager exercised all of the executive power in Xenia. *Id.* "The mayor has himself as such no

---

must rely on court costs for his livelihood. Moreover, some creditors file claims with justices of the peace when summons has to be sent outside the county to be served. Even if the J.P. recognizes the invalidity of such an action and mentions it, the creditor may insist that it be processed anyway, knowing that an uninformed defendant might never know the difference and pay the debt, including court costs, on a void judgment. The justice of the peace is naturally under great pressure to not turn down this "business" for fear of losing all that creditor's civil suits, on each one of which he is entitled to a $5.00 fee.
(Exhibit filed in the record).

8. It is incredible that the justice of the peace system has been able to survive in many parts of this country down to our modern times. It was brought to this country by the British colonists and in spite of its lack of a place in our present society has tenaciously continued to exist and operate. There is a definite trend in the United States today to abolish this outmoded institution and this accomplishment will not be premature. Perhaps no other part of our judicial machinery could be abolished so justifiably.

. . . . .

Although the lack of any professional qualifications alone would make this institution a mockery of justice, the fact that compensation is by fee creates another obvious evil in the system. Fees are collected from parties in the form of costs. In order to increase business, decisions may be rendered in favor of those who bring the business and not in favor of the one who has the law on his side. The temptation of practicing malfeasance is thus fostered by the economics of insecurity in the office.
Bunkley, "Some Observations on Our Judicial System", 26 Miss.L.J. 1, 10–11 (1954) (footnote omitted).

executive but only judicial duties. His relation under the Xenia charter, as one of five members of the city commission, to the funds contributed to by his fines as judge, or to the executive or financial policy of the city, is remote." *Id.*

After *Tumey* a number of courts held that unconstitutional defects caused by a fee system could be cured by procedural safeguards such as a right to a change of venue [9] or a right of trial by jury.[10] The Supreme Court rejected these attempts to circumvent *Tumey*. In *Ward v. Village of Monroeville*, 1972, 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267, the Supreme Court considered a third Ohio compensation system. In addition to presiding over the mayor's court, the Mayor of Monroeville had broad executive powers. He was responsible for village finances and was president of the village council. Fees, fines, forfeitures, and costs imposed on convicted criminal defendants provided a "major part" of the village's funds. The Supreme Court repeated the exact language of the *Tumey* standard. "[T]he test is whether the mayor's situation is one 'which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the State and the accused...'". 409 U.S. at 60, 93 S.Ct. at 83. A "possible temptation" could exist "when the mayor's executive responsibilities for village finances may make him partisan to maintain the high level of contribution from the mayor's court". *Id.* The Court distinguished the case from *Dugan* because there the mayor had "very limited" executive authority, and his relation to finances and financial policy was "too remote" to warrant a presumption of bias toward conviction of criminal defendants. *Id.* at 60–61, 93 S.Ct. at 83. The Court expressly rejected the contention, also made by the defendants in these cases, that the "procedural safeguard" of an appeal and a de novo trial corrected any unfairness at the trial level:

This "procedural safeguard" does not guarantee a fair trial in the mayor's court; there is nothing to suggest that the incentive to convict would be diminished by the possibility of reversal on appeal. Nor, in any event, may the State's trial court procedure be deemed constitutionally acceptable simply because the State eventually offers a defendant an impartial adjudication. Petitioner is entitled to a neutral and detached judge in the first instance.

*Id.* at 61–62, 93 S.Ct. at 83–84.

The "possible temptation" standard established in *Tumey* and *Ward* was reaffirmed in *Gibson v. Berryhill*, 1973, 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488, a case that did not involve justice of the peace courts but involved decisionmakers. Licensed optometrists, who were not members of the Alabama Optometric Association, were charged by the Association with unprofessional conduct. Because the board hearing the cases was composed of optometrists in private practice for their own account, the district court concluded that the success of the board in revoking the licenses of all optometrists who were employed by business corporations would possibly redound to the personal benefit of members of the board. The district court held that the issue was not whether the board members were actually biased, but whether in the natural course of events there was a "possible temptation" to an average man sitting as a judge to try a case with bias for or against any issue presented to him. 411 U.S. at 571, 93 S.Ct. at 1674. The Supreme Court affirmed the district court's finding of a source of possible bias sufficient to disqualify the members of the board because "of possible personal interest". 411 U.S. at 579, 93 S.Ct. at 1698.

The defendants attempt to distinguish *Ward* on the ground that, unlike the State of Mississippi, the State of Ohio does not provide for a jury trial. They cite footnote 3 in *Ludwig v. Commonwealth of Massa-*

---

9. *Application of Borchert*, 1961, 57 Wash.2d 719, 359 P.2d 789.

10. *Melikian v. Avent*, N.D.Miss. 1969, 300 F.Supp. 516; *People v. Cheever*, 1963, 370 Mich. 165, 121 N.W.2d 430; *Ex parte Steele* (1942), 220 N.C. 685, 18 S.E.2d 132.

*chusetts*, 1976, 427 U.S. 618, 627, 96 S.Ct. 2781, 2786, 49 L.Ed.2d 732. But *Ludwig* did not relate to possible bias by the court. The Court held, among other holdings, that the denial of a defendant's right to trial in a two–tier system was not unconstitutional. The right to a jury trial is, historically, a safeguard, but as the Supreme Court said in the footnote, "There is no question, of course, that a person who is accused of crime may receive a fair trial before a magistrate or judge". In any event, an accused has a right to an unbiased magistrate or judge–with or without a jury. And he has this right–with or without the right to appeal and a trial de novo before a jury.

Here the possible temptation is not as obvious on its face as it was in *Tumey* and *Ward*, but the *Tumey–Ward* standard controls this litigation.

### III.

We consider first the question whether the Mississippi system of compensating Justice Court Judges in criminal cases, Miss. Code Ann. § 25–7–25(g), is unconstitutional as applied in Hinds and DeSoto counties where two judges have concurrent jurisdiction over each district.

On principle, it is difficult to distinguish the judge's role in criminal cases from his role in civil cases. In each instance he is tempted to depart from judicial neutrality. The plaintiffs, however, perhaps because of the district court's detailed findings of fact justifying disparity in fees in the criminal system, narrowed their challenge to the system in Hinds and DeSoto counties. The system in these counties represents an a fortiori case for the plaintiffs: there are two judges in each district in direct competition for business. In the City of Jackson the offices of competing judges are separated by just a few blocks; one office is as convenient and accessible as the other.

The district court's opinion upholding the constitutionality of Miss. Code Ann. § 25–7–25(g) expressly mentions the basis of the plaintiffs' attack on the fee system as applied in Hinds and DeSoto counties. Unfortunately, the trial judge made no specific findings on the fee system in those two counties and counsel for the plaintiffs did not draw the court's attention to the matter. Instead, the defendants and the court made the dubious assumption that the system as a whole is valid because the disparity in filings can be explained by differences in districts. For example, the conclusion of the section in the court's opinion dealing with criminal fees has two full pages dealing with Judge Frisby's complaints. Judge Frisby was in a single–judge district in Hancock County on the Mississippi Gulf Coast. He had complained that the highway patrolmen "made tickets returnable only to 'convicting judges'". The district court concluded that the plaintiffs' evidence was "unpersuasive" and that "the genesis of this disparity is the same as that previously discussed in this opinion in regard to Frisby and related situations, e. g. difference in highway mileage, types and classes of roads, traffic counts, accident and fatality rates, and seasonal traffic variations". These reasons for disparity in filings are inapplicable to two–judge districts. There was no evidence that any judge in the City of Jackson, Hinds County, was superior in accessibility to his competitor in his district. There was evidence that Judge Garner of Jackson, who resigned as a justice of the peace, was a well qualified lawyer but could not obtain enough cases to stay in business.[11]

When the record can be intelligently reviewed, the absence of factual findings may be overlooked by the appellate court. *Davis v. United States*, 5 Cir. 1970, 422 F.2d 1139, 1142; *Nader v. Allegheny Airlines*,

11. Former Justice Court Judge James L. Garner testified that highway patrol tickets constituted a major source of income for judges. According to Garner, from January 1969 to June 1969, traffic tickets were divided as follows between judges in the five districts in Hinds County:

| District I | | |
|---|---|---|
| | Judge Garner | 276 |
| | Judge Patterson | 1,239 |
| District II | | |
| | Judge Vance | 421 |
| | Judge Condia | 2 |

*Inc.*, D.C.Cir. 1975, 512 F.2d 527, 540, *rev'd on other grounds*, 1976, 426 U.S. 290, 96 S.Ct. 1978, 48 L.Ed.2d 643; *Urbain v. Knapp Bros. Mfg. Co.*, 6 Cir. 1954, 217 F.2d 810, 816, *cert. denied*, 1955, 349 U.S. 930, 75 S.Ct. 772, 99 L.Ed. 1260. This is such a case. The constitutional issue is straightforward and clearly drawn, the mechanics of the fee system are easily comprehended, and the evidence in the record speaks for itself. We perceive no benefit to be gained from remanding this case to the district court for further proceedings.

Our review of the record and legal commentary bears out the plaintiffs' assertion that the fee system, at least in Hinds and DeSoto counties, denies defendants the due process guarantee of a fair trial before an impartial judge, under the *Tumey–Ward* test for determining bias. *See Johnson v. Mississippi*, 1971, 403 U.S. 212, 216, 91 S.Ct. 1778, 1780, 29 L.Ed.2d 423, 427. Because of the relation between the judge's volume of cases and the amount of his judicial income, the fee system creates a *possible temptation* for judges to be biased against defendants. There is no getting around this inherent vice in a system where two judges, dependent on fees for subsistence, have concurrent jurisdiction.

The income of judges in all Mississippi counties depends on the volume of criminal cases heard. But in the districts where judges have concurrent criminal jurisdiction, and venue in a district may be based on one of three facts, law enforcement officers have discretion as to which judge in the district will hear each case.

Although Mississippi Highway Patrol officers are instructed to divide traffic tickets evenly between judges in the arresting jurisdiction, the Chief of the Mississippi Highway Patrol acknowledged the existence of the continuing problem of highway patrolmen favoring certain judges.[12] Documentary evidence, especially relating to traffic tickets, confirms this testimony and reveals a wide disparity in the caseload of judges in several districts within Hinds and DeSoto Counties. The statistics are startling.[13] Using Occam's Razor, the simple and obvious explanation for this disparity is that arresting officers make affidavits returnable to the judge they believed most likely to convict the defendant. The temptation was there, as the arresting officers well knew. The convicting judges may even have been actuated by the highest motives, by a stronger feeling that the law must be strictly enforced than the feeling that constitutional and procedural rights must be protected, but the system results in a biased tribunal. As was said many years ago, the real viciousness of the fee system arises not

| District III | | |
|---|---|---|
| | Judge Sims | 160 |
| | Judge Hines | 0 |
| District IV | | |
| | Judge Kelly | 158 |
| | Judge Foster | 1,562 |
| District V | | |
| | Judge Fuquor | 412 |
| | Judge Richardson | 1,086 |

| Highway Patrol | Judge Davis | Judge Foster |
|---|---|---|
| Abel | 182 | 86 |
| Amacker | 66 | 2 |
| Dawson | 98 | 50 |
| Dunlop | 93 | 67 |
| Edwards | 101 | 142 |
| Gonce | 98 | 35 |
| Krohn | 141 | 38 |
| Martin | 102 | 47 |
| Morrison | 125 | 10 |
| Whitworth | 63 | 9 |
| Braun | * | 66 |
| Moody | * | 132 |
| (*substantially none) | | |

In 1968, 184 highway patrol tickets were issued returnable to Judge Condia's court and 1,645 were issued returnable to Judge Vance.

The record also shows that specific highway patrol officers preferred one judge over another. Between October 1972 and March 1973, officers patrolling District IV in Hinds County divided tickets between judges as follows:

12. Judge Garner testified that when he became a Justice Court judge, highway patrolmen informed him that they did not issue traffic citations unless the person charged was guilty.

13. *See* note 11. *Supra.*

from the possibilities it offers for unscrupulous revenue, but from the psychological attitude it engenders; namely, a conscious or unconscious prejudice where the testimony is at best evenly balanced. Such a frame of mind subtly eliminates the legal safeguard which requires evidence of guilt beyond a reasonable doubt before a person can be convicted of a crime. G. Warren, *Traffic Courts*, 211 (1942).

Testimony of law enforcement officers and experts in police science supports the plaintiffs' assertion that law enforcement officers have an interest in the outcome of criminal cases in which they participate. Arresting officers naturally seek convictions.[14] Significantly, the Chief of the Mississippi Highway Patrol testified that in considering an officer for promotion, the department examines the officer's record to determine the number of arrest citations issued by the officer and the number of convictions that resulted.

The record includes extreme examples of the abuse of the fee system. A Hinds County Judge, T. A. Vance, a named defendant in this suit, purchased a radar machine for use by the highway patrol in his district and claimed the cost of the machine as a business expense on his federal income tax return. Another judge, Howard E. Scott of Pike County, Mississippi, identified himself as an agent of the highway patrol and issued notices to recipients of traffic citations under the following letterhead:

"State of Mississippi Highway Patrol
Justice of the Peace
Pike County
Judge Howard E. Scott"

On occasion, some judges complained to the highway patrol over the failure of patrolmen to divide traffic citations evenly among judges in a particular district. As least one judge in a Hinds County district, Judge James Garner, was compelled to close his office because virtually all of the traffic tickets issued in his district were returned to the district's other justice court judge.

■ We need find no instance of actual judicial bias to hold the fee system constitutionally infirm. *Tumey* and *Ward* do not require proof of actual judicial prejudice or of a direct pecuniary interest in the outcome of particular cases. The test is whether a fee system presents a "possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the State and the accused". *Tumey*, 273 U.S. at 532, 47 S.Ct. at 444; *Ward*, 409 U.S. at 60, 93 S.Ct. at 83. Because the possibility exists that judges in Hinds and DeSoto counties will compete for business by currying favor with arresting officers or taking biased actions to increase their caseload, we conclude that, under the fee system, a judge might minimize the burden of proof required to convict the defendant or might be less than diligent in protecting the defendant's constitutional rights. The fee system, therefore, does not satisfy the *Tumey–Ward* test and deprives criminal defendants of their due process right to a trial before an impartial tribunal.

■ The defendants argue that the possible bias of judges can be avoided by a criminal defendant exercising his right to a jury or corrected by a trial de novo in the county court. The Supreme Court has stated that the right of a criminal defendant to an appeal and a trial de novo before an impartial tribunal does not remedy constitutional defects in an earlier trial. *Ward v. Village of Monroeville*, 409 U.S. at 61–62, 93 S.Ct. at 83–84, 34 L.Ed.2d at 271–72; *see Whalen v. Johnson*, E.D.Mich.1977, 438 F.Supp. 1198, 1204; *Iglesias–Delgado v. Rivera–Rivera*, D.P.R.1976, 430 F.Supp. 309, 311–12. This rule applies with equal force where a criminal defendant is given a choice between a trial before a potentially biased judge and a jury. Furthermore, because justice court judges preside over jury trials, it cannot be said that a criminal defendant is any more likely to obtain an impartial adjudication should he be tried by a jury rather than before a judge. Criminal defendants are entitled to a fair trial

---

14. *See* Lummes, *The Trial Judge* 80 (1937); G. Warren, *Traffic Courts* 218 (1942); Reynolds, *supra* note 4, at 378; Sunderland, *supra*, note 4, at 331, 333.

before both judges and juries in Mississippi Justice Courts.

We hold that the record shows that the criminal fee systems in Hinds and DeSoto counties are in violation of the due process clause under the *Tumey–Ward* test.

## IV.

 We consider in this section the district court's determination that the civil side of the Mississippi fee system, Miss. Code Ann. § 25–7–25, comports with due process.[15] As we noted, the Code provides that the judge receive a fee of $15 for each case filed in his court.

The district court wrote:

The Court ... finds that on numerous occasions Justice Court Judges have found in favor of the defendants in contested civil cases or entered judgment for less than that sued for by the creditor–plaintiffs, and yet creditor–plaintiffs continue to file suits in their courts. The evidence presented herein negates the contention of the plaintiffs that Justice Court Judges disregard the mandate of the law and the facts of a particular case, and perfunctorily find for the plaintiff and against the defendant, and thus deny defendants due process of law.

The Court is fully aware of, and has studied with care, the testimony of various witnesses presented by the plaintiffs who are opposed to the fee system and who testified to their subjective feelings that it produced pressures on the individual judge to decide the cases before him in a certain way. If the test were whether the plaintiffs were able to produce the

testimony of any person that the fee system presented a source of possible temptation, the court might conclude that they should prevail; however, the test is whether the system presents a "possible temptation to the *average man* as a judge", and the court finds that the plaintiffs have not carried their burden under this test, particularly in light of the presumption of [a judge's] honesty and integrity....

The court concluded that the plaintiffs had failed to "overcome a presumption of honesty and integrity to those serving as adjudicators".

We conclude that the district court used the wrong standard. There is no language in *Tumey* or *Ward* qualifying the "possible temptation" standard by the necessity of overcoming the presumption of probity in favor of adjudicators. *That* added burden comes from *Withrow v. Larkin*, 1975, 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712, upon which the district court and the defendant strongly relied. But the question in *Withrow* was whether a board of physicians could exercise both investigative and adjudicative functions. This is not an unusual situation in administrative agencies. There was no question of the members of the board profiting personally from its decision. As the Supreme Court points out, "The processes utilized by the Board, however, do not in themselves contain an unacceptable risk of bias". 421 U.S. at 54, 95 S.Ct. at 1468. But "various situations have been identified in which experience teaches that the probability of actual bias on the part of the judge or decisionmaker is too high to be

---

**15.** The civil side of the Mississippi Justice Court fee system was attacked as unconstitutional, on the same ground at issue here, eleven years ago. In a per curiam opinion by a three–judge district court, *Melikian v. Avent*, N.D. Miss. 1969, 300 F.Supp. 516, this system was upheld. The Court wrote:

In the case sub judice the Justice of the Peace received his fee regardless of the outcome of the case. The argument that the [judge] must favor the plaintiff in order to secure the business does not impress the Court as having merit. Counsel does not refer the Court to any authority to sustain

this assertion and the Court has found none on independent research.
300 F.Supp. at 518.

Since *Melikian*, we have the advantage of *Ward's* analysis. It leads us to examine the workings of the fee systems with a nicer scrutiny than that employed in *Melikian*, which we can no longer consider persuasive. In addition, the *Melikian* court found that the option of a jury trial cured any possible due process effect. In Part II we discussed why the possibility of a jury trial does not cure in the particular case the due process defect in an entire system.

constitutionally tolerable. Among these cases are those in which the adjudicator has a pecuniary interest in the outcome . . .". The Court cited in support of this statement *Tumey, Ward*, and *Berryhill*.

In these cases, the Supreme Court was fully aware that a presumption of probity attached to adjudicators but it was concerned over the "possible temptation to the average man" of yielding to the expectation of personal gain by abandoning neutrality. "Not only is a biased decisionmaker constitutionally unacceptable but 'our system of law has always endeavored to prevent even the probability of unfairness'". *Withrow*, 421 U.S. at 47, 95 S.Ct. at 1464, *citing In re Murchison*, 1955, 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942, and *Tumey*.

In *Tumey* and *Ward* the Supreme Court, as we read the opinions in those cases, was not as interested in the probity of an individual judge or perhaps even, of the great majority of judges. It was interested rather in the inherent defect in the legislative framework arising from the vulnerability of the average man–as the system works in practice and as it appears to defendants and to the public. The Court's inquiry there and our inquiry here is not whether a particular man has succumbed to temptation, but whether the economic realities make the design of the fee system vulnerable to a "possible temptation" to the "average man" as judge. Here we have no need to be solicitous of the honor of a particular judge; none has been questioned. Nor do concerns of judicial administration necessarily require a high evidentiary barrier. The *Tumey–Ward* test, in sum, is levelled at the system, not the individual judge. This is the reason it speaks of temptation to the average man. The "average man as judge" concept was made the heart of the test to introduce a humble Everyman, prey to the vicissitudes of life, the need for bread on the table, and for small favors from the right people.

The effect of the district court's approach was to force the plaintiffs to carry too heavy an evidentiary burden. It was not necessary for the plaintiffs to show that justice court judges perfunctorily find for plaintiffs and against defendants. *Tumey* and *Ward* make it clear that a violation of due process occurs when the *system* creates the *possibility* that judges will fail to hold "the balance nice, clear and true". Nor is the plaintiffs' argument refuted by evidence that "on numerous occasions" some justice court judges have judged fairly.

The Supreme Court of Appeals of West Virginia struck down a similar civil fee system in *State v. Poteet*, W.Va. 1974, 202 S.E.2d 628, on state and federal constitutional grounds. The Court wrote:

[The Justice of the Peace fee statute] provides that a Justice of the Peace, in civil cases, "shall charge and collect" a fee of $5 "[f]or entering and trying any civil suit * * * whether *the suit be contested or uncontested* and whether or not the suit be completed or discontinued." Clearly, under the fee system provided in the above statute, the income of the Justice of the Peace is determined by the number of cases instituted in his court. It necessarily follows that the more cases he handles the more $5 fees he will receive.

\* \* \* \* \* \*

Although this case is civil rather than criminal, the principle expressed in *Tumey* applies. Code, 1931, 50–17–1, as amended, wherein it provides that a Justice of the Peace shall charge and collect a $5 fee, not only permits but in fact encourages one to favor those who will bring him "business". *The incentive to increase the number of $5 fees is built into the statute.* (Emphasis added.)

202 S.E.2d 628, 631–32.

The compensation the justice court judges in Mississippi derive from civil cases depends directly on the volume of cases filed. Creditors could choose, in any county in which suit is proper, which judge to decide their cases. It is reasonable to infer, and the record supports the inference, that creditors would file more frequently in the courts of the judges who tended to favor the plaintiffs. There was testimony to this

effect,[16] and further testimony to the effect that judges knew and understood this to be the case.[17] As noted, the caseload in courts could and did fall so low as to put a judge out of business while his competitor prospered.

The evidence is undisputed that the civil cases are unevenly distributed throughout the judges in the various counties.[18] The district court attributed the uneven distribution of cases to unexceptional forum shopping by creditor–plaintiffs; there is, of course, a forum–shopping in many areas of the law. It does not follow, however, as the district court argued, that no due process violation can be demonstrated by an uneven case distribution–when the judge has a direct interest in larger total fees resulting from a larger volume of business. The system is indeed violative of due process.

16. Two judges testified as follows:

A: Welcome what I'm saying there are some persons who talk to us, to me, in such matters and these are of the matters I have never wanted to respond to.

Q: You mean–. You are talking about creditors now who are laying the heat on you?

A: Yes, uh–huh, who want us to do these kind of things, and those are some of the things that I . . . eh, don't do.

Q: What has happened, Judge, when you have refused to do these things for the creditors?

A: Welcome this is what I'm saying. Eh, your business, they break down–your business. They don't bring you no more business.

Deposition of Scott, Adams County, P–3 at 15–16.

Q: Do you feel that your refusal to solicit any civil business puts you at a disadvantage in obtaining civil business?

A: I feel sure it does.

Deposition of Herring, Hinds County, P–98 at 16.

17. One judge said in deposition:

Q: If they (creditors) did not like the way that their business was handled in this Court, they would take and file it with someone else?

A: Yes.

Deposition of Smith, Washington County, P–67 at 8.

A: I don't know their reason for bringing their accounts to me, and I don't know how many they take to the other J.P.s.

Q: But one reason would certainly be your having been in the credit collection business yourself?

A: Yes, I think I am good at my job, and I think that that is the reason I've gotten a good many, because I am now good and they will try to see if they can get good results on their suits of course.

Deposition of Breland, Warren County, P–64 at 15.

Q: If you don't handle the business well you know that there is a likehood or at least a strong possibility that the business is going to end up somewhere else?

A: Well, that may be so. I can only say that I have tried diligently, but my volume of suits–I am not going to call the business, but volume of suits is off from what it was two years ago.

Deposition of Patterson, Hinds County, P–76 at 48.

Q: Businesses generally want to get the best deal for their money that they can, is that not true? As long as they can stay legal?

A: I'd say that I have to go along with the theory or the assumption that they want the best deal.

Id. at 49.

Q: In your experience in the Justice of the Peace, have you found any other reasons that a business establishment might select one particular justice of the peace, other than the nearness of the justice of the peace office from their place of business?

A: I could tell you why I would if I was a plaintiff, and that would be the service that I got.

Deposition of Hendrick, Hinds County, P–77 at 20.

18. In Hinds County, for example, where all ten justice court judges have full–time offices within the city limits of Jackson, the breakdown of civil cases for the six months' period April 1, 1976 through September 30, 1976 was:

| | | Total Cases | Percent of Total |
|---|---|---|---|
| District 1 | Herring | 688 | 8% |
| | W. N. Patterson | 275 | 3% |
| District 2 | Williams | 1422 | 17% |
| | Covington | 363 | 4% |
| District 3 | Moore | 1086 | 13% |
| | Martin | 1114 | 13% |
| District 4 | Bass | 732 | 9% |
| | Foster | 237 | 3% |
| District 5 | Hendrick | 1648 | 20% |
| | F.O. Patterson | 818 | 10% |

Similarly in Lowndes County, the breakdown of civil cases among the three justice court judges with full–time offices located in Columbus for the same period was:

| | Total Cases | Percent of Total |
|---|---|---|
| District 1 – Linn | 144 | 17% |
| District 2 – Dale | 355 | 42% |
| District 3 – Crowder | 346 | 41% |

Possible temptation bloomed into questionable behavior. Judges advertised in the yellow pages of telephone books. Several judges listed on their tax returns lunch and entertainment expenses for "clients", creditor–plaintiffs, and for advertising. One judge used a business card reading as follows:

We work on bad checks around the clock.
SATISFACTION GUARANTEED
Also on bad accounts.
References Furnished On The Jobs We Perform

We conclude that the Mississippi civil justice court fee system presents a "possible temptation to the average man as judge", making it difficult, if not impossible, for judges to hold the balance "nice, clear and true" between plaintiff and defendant.[19] Because the district court did not apply the *Tumey–Ward* standard and because substantial evidence does not support the district court's findings of fact, we hold that the fee system in civil cases in the State of Mississippi violates due process.

### V.

We consider finally the district court's determination that the Mississippi statue permitting an additional fee for further proceedings involving levy of execution on judgments and attachment and garnishment proceedings is unconstitutional. The district court wrote:

Thus, when a civil case is filed in a Justice Court and costs are prepaid, the Judge will receive his $8 fee no matter what the outcome of the case. However, if judgment is rendered for the plaintiff and execution levied or garnishment issued on the judgment, the Judge will receive an additional $8 fee. Even though from eighty to ninety-five per cent of the civil and criminal actions in Justice Court are uncontested, this fact creates a direct potential pecuniary interest for the Judge in the outcome of all civil cases filed in this court.... A Justice Court Judge, therefore, has an unconstitutional pecuniary interest in favoring plaintiffs who file civil suits in his court to this extent, and this portion of Mississippi's fee system cannot withstand the test of the *Tumey* rationale.

We agree with the district court's resolution of this matter, and affirm its holding as to post–judgment fees. Few, if any, cases are affected by this holding, for the statute has now been amended to abolish the additional fee.

\* \* \* \* \* \*

The judgment of the district court is AFFIRMED in part and REVERSED in part.

### ON REHEARING AND REHEARING EN BANC

PER CURIAM:

The petition for Rehearing is DENIED and no member of this panel nor Judge of this Administrative Unit in regular active service having requested that the Court be polled on rehearing en banc (Rule 35, Federal Rules of Appellate Procedure; Local

---

19. Judge Patterson testified:

Q: I understand from talking to you before, it is your feeling that sometime a really big creditor has the feeling he owns the justice of the peace he files lawsuits with?

A: That's correct. Sometimes they want to try to tell you what to do and I had a few words with some of them sometimes along the line and some of them withdrew their business from me....

\* \* \* \* \* \*

A: I know that I made one man pay me a court cost when I dismissed the suit wherein he had sued the man and the man had paid him in full and brought the receipts in to show, and when I dismissed the case and assessed the cost to him, he seemed somewhat grieved that I would follow the letter of the law on that and he informed me that that was the last business that he would bring to my court. Well my attitude in that respect was perhaps one reason that I resigned in December of 1970, before I finished my term, because I actually did not make expenses and the record would show that personally it had cost me money to keep my office open.... This particular person was in business and he had previously given me a considerable amount of civil business, which, of course, he had the privilege of carrying his business any where he wanted it....

Deposition of Patterson, P–89 at 20.

Fifth Circuit Rule 16; Fifth Circuit Judicial Council Resolution of January 14, 1981), the suggestion for Rehearing En Banc is DENIED.

Except as to the cases now before this Court, consolidated under the number 78–3225, the Court's judgment and rulings rendered January 30, 1981, shall operate prospectively from and after the date the mandate shall issue.

The issuance of the mandate is stayed until April 10, 1981.